NATIONAL AIR CARRIER ASSOCIA-
TION, American Flyers Airline Corpo-
ration, Capitol International Airways,
Inc., Overseas National Airways, Inc.,
Saturn Airways, Inc., Trans Interna-
tional Airline, Inc., World Airways, Inc.,
Petitioners,

v.

CIVIL AERONAUTICS BOARD,
Respondent,

Pan American World Airways, Inc., Trans
World Airlines, Inc., Creative Tour Op-
erators Association, Intervenors.

No. 23012.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 2, 1969.

Decided May 28, 1970.

Mr. Robert M. Lichtman, Washington,
D. C., with whom Mr. Jerry D. Anker,
Washington, D. C., was on the brief, for
petitioners. Mr. Leonard N. Bebchick,
Washington, D. C., also entered an ap-
pearance for petitioners.

Mr. Warren L. Sharfman, Associate
Gen. Counsel, Litigation and Research,
Civil Aeronautics Board, with whom
Messrs. Joseph B. Goldman, Gen. Coun-
sel, O. D. Ozment, Deputy Gen. Counsel,
and Robert L. Toomey, Attorney, Civil
Aeronautics Board, were on the brief,
for respondent. Mr. Howard E. Shapiro,
Attorney, Department of Justice, also en-
tered an appearance for respondent.

Mr. Robert N. Duggan, Washington,
D. C., entered an appearance for interve-
nor, Pan American World Airways, Inc.

Mr. Ulrich V. Hoffman entered an ap-
pearance for intervenor, Trans World
Airlines, Inc.

Mr. Andrew L. Frey entered an appearance for intervenor, Creative Tour Operators Assn.

Before McGOWAN, TAMM and ROBB, Circuit Judges.

TAMM, Circuit Judge:

In this petition we are confronted with the question of whether the Civil Aeronautics Board erred in approving without a hearing certain transatlantic fare agreements adopted by the member air carriers of the International Air Transport Association. For the reasons hereinafter stated, we hold that the Commission's action must be affirmed in part and reversed in part.

## I. THE FARE AGREEMENT

The International Air Transport Association (IATA) is a trade organization of domestic and foreign air carriers which are engaged in scheduled international air transportation. The member carriers periodically meet in "traffic conferences" to take joint action on matters of mutual concern, including types of fares offered to the public. These agreements, which take the form of resolutions, are subject to approval by the parent nations of the member carriers; in this country, the Civil Aeronautics Board has long asserted jurisdiction over IATA resolutions under section 412 of the Aviation Act, 49 U.S.C. § 1382 (1964). *See generally* IATA Traffic Conference Resolutions, 6 C.A.B. 639 (1946). The Board's approval of an IATA resolution confers antitrust immunity by virtue of section 414 of the Act, 49 U.S.C. § 1384 (1964); the rates contemplated by the agreements are then embodied in tariffs which are filed with the Board pursuant to 49 U.S.C. § 1373 (1964). On the other hand, if any member carrier's government disapproves an IATA agreement, or if the agreement otherwise expires, an "open rate" situation is created. When this happens, each carrier is free to set its own fares, subject, of course, to any limitations imposed by its government. Conflicts among nations as to appropriate fare levels must be resolved by diplomatic consultation; if this effort is unsuccessful, nations may exclude foreign carriers charging unacceptable fares. Thus, the danger that an open rate situation may disrupt harmonious international relations is obvious.

The resolutions presently in issue, which relate to fares offered between this country and Europe, are the product of a series of IATA traffic conferences held in Cannes, France and Dallas, Texas in 1968 and early 1969. In general, they were designed to be in effect for a two-year period terminating on March 31, 1971. The fare package itself is lengthy, complex, and esoteric, but for present purposes its salient features may be summarized as follows:

(1) Fare increases for individually-ticketed passengers were effected through elimination of the five per cent discount for passengers purchasing round-trip tickets.

(2) Contract Bulk Inclusive Tour Fares (CVIT's)—This set of fares provides for the sale of blocks of seats to tour operators, who will then retail them to the public as part of inclusive tours composed of ground accommodations as well as air transportation.

(3) Affinity Group Fares—These fares are available only to groups which are comprised of members of an organization existing primarily for purposes other than travel, and which satisfy other prescribed limitations. Fare levels vary with the size of the group, the season of the year, and the direction of travel.

(4) Incentive Group Fares—Like the CBIT's, the Incentive Group Fares are a promotional innovation. They are available to groups of a specified size which are composed of employees, dealers, or agents of a profit-making

organization, and which are traveling under an established "incentive travel program" rewarding past work or encouraging future activity.

(5) Group Inclusive Tour Fares (GIT's)—These fares are available to groups of fifteen or more purchasing package tours from a tour operator; the tours must include a specified minimum expenditure for ground accommodations.

(6) California Proportional Fares— The IATA resolution also reduced the "proportional fares," or amounts added on to the basic transatlantic fare, for passengers originating their flights in California rather than New York; proportional fares from other points outside of New York were not significantly changed.

The agreements embodying these fares were duly filed with the Civil Aeronautics Board early in 1969.[1]

## II. PROCEDURAL HISTORY OF THE CONTROVERSY

The procedural steps underlying the present posture of this case constitute only a small portion of the continuing battle between the scheduled airlines which are members of IATA and the supplemental carriers. The supplementals, which include both foreign and domestic airlines, are engaged in providing charter transportation only. *See* 49 U. S.C. § 1301(33) (1964). In contrast, the IATA regular-route carriers offer both charter and regularly scheduled services. In the past few years, the percentage of all transatlantic passengers using charter rather than scheduled services has increased, and the market share of the supplemental carriers has

increased also. (Brief for the Respondent at 7 n. 7.) The competition between the supplementals and the scheduled airlines for charter passengers is direct and intense.

On February 25, 1969, shortly after the IATA resolutions described above had been filed, the National Air Carrier Association (NACA) informed the Civil Aeronautics Board of its intention to oppose the agreement. (App. 10 n. 2.) NACA is a trade organization of supplemental carriers; the six other petitioners in the present action are members of this organization. On March 3, 1969, the Board issued an order establishing the schedule for receipt of documentary evidence, complaints, objections, and answers relating to the IATA resolutions. This schedule was expedited because of "the fact that the agreement contains controversial elements and is intended to become effective in a relatively short period of time." (App. 10–11.) NACA thereupon filed a petition for reconsideration of this procedural schedule, alleging in essence that the substantiality and complexity of the issues presented by the agreement demanded an evidentiary hearing, rather than an exchange of documents, as a basis for proper decision. (App. 12–19.) Later, NACA filed a motion to suspend the procedural schedule (App. 65–71) which was denied by the Board. (App. 82.)

On April 4, 1969, after various papers had been filed by the participating parties, the Board issued another order scheduling oral argument "in light of the considerable controversy surrounding the agreement" (App. 201), but continuing in its determination that an evidentiary hearing was unnecessary. Oral argument was held on April 16, and on April 30, 1969, the basic order presently under challenge was issued. In this April 30 order, the Board granted ap-

---

1. As originally promulgated, the IATA resolutions provided that the previously existing fare structure would remain in effect "until 30 April 1969 or until the [new] Resolutions * * * become effective, whichever is later." (App. 131.)

Subsequently, however, IATA notified the Board by letter that "all the words after 30 April 1969 should be deleted." (Reply Brief for the Petitioners at 7 n. 5.)

proval for the full term of the agreement to the Affinity Group, Incentive Group, and GIT fares. At the same time, the order granted approval through March 31, 1970 to the elimination of the round-trip discount, the CBIT's, and the California Proportional Fares,[2] and ordered an expedited investigation of the desirability of extending approval beyond that date. NACA sought a stay of this order pending judicial review, but the Board denied the motion. (App. 271–281.) Thereafter the intervenors in the present action and several other parties to the administrative proceedings moved for reconsideration of the April 30 order, seeking an extension of the limited-term approval of the CBIT fares. This motion was denied by the Board on July 16, 1969. (App. 290–293.) In the present action, the petitioners assert two major grounds for reversal: (1) that the Board erred in approving the three group fares without an evidentiary hearing, and (2) that the Board's findings were insufficient to support interim approval for those fare changes which were scheduled for further investigation. A third major question emerged clearly at oral argument: does the Civil Aeronautics Board have statutory power to grant the kind of interim approval, or "approval *pendente lite*," that it ordered in the present case?

Subsequent to the filing of the instant petition for review, a number of significant developments in the controversy transpired. On October 19, 1969—approximately three months after the Board had denied the petition to reconsider the April 30 order—the underlying IATA conference resolutions expired as a result of the withdrawal of the Italian airline Alitalia from the agreement. This withdrawal was made possible by an IATA rule which permits any member carrier to terminate an agreement if any of the other carriers' governments places conditions on its approval of the agreement; Alitalia evidently took the position that the Board's interim authorization of the CBIT fare amounted to a conditional approval. A new traffic conference was convened for the purpose of reaching another fare agreement and ending the open rate situation caused by Alitalia's withdrawal.

At the time that Alitalia withdrew from the IATA agreement, there was pending before the Board a motion by Pan American World Airways seeking reconsideration of the April 30 order and an extension of the interim approval of the CBIT fares through September 30, 1970. On November 26, 1969, the Board issued another order which technically dismissed Pan American's petition as moot, but accepted the basic arguments in favor of extending the approval of the CBIT's and allowed the tariffs filed pursuant to the expired IATA resolution to remain in effect. Order 69–11–122 (Nov. 26, 1969). Petitioners subsequently filed a motion to include this November 26 order within the scope of the present petition for review, but this motion has been denied.

On December 11, 1969, the Board's hearing examiner issued his initial decision[3] regarding the three fares which had been set for evidentiary hearing in the April 30 order. In this decision the examiner concluded in general that the elimination of the round-trip discount was adverse to the public interest, but that the CBIT and California Proportional fares were not. The examiner also ordered the American scheduled carriers and supplementals to continue supplying monthly traffic data to

2. In the April 30 order, the Board stated that the investigation of the California Proportional fares would be considered a part of the investigation of the CBIT's (App. 258); in addition, the Board conditioned its approval of the proportional fares on the making of adjustments which would equalize fares for passengers originating their flights in specified eastern cities with fares for those originating in New York City. (App. 262.)

3. IATA Agreements Relating to Transatlantic Fares, C.A.B. Docket No. 20,781 (Initial Decision, Dec. 11, 1969).

the Board. The Board determined to review this initial decision (Order 69–12–86, December 19, 1969), but shortly thereafter, on December 29 and 30, 1969, the IATA carriers reached a new fare agreement which was the product of a traffic conference held in Caracas, Venezuela. This agreement embodied many of the same features contained in the resolutions presently under review; accordingly, the Board considered the Caracas agreement as a part of its pending proceeding. On February 27, 1970, the Board issued two orders relating to these resolutions. The first of these, Order 70–2–123, dealt with fare elements peculiar to the Caracas agreement; the second, Order 70–2–124, concerned fares which were common to both the Cannes/Dallas agreement and the Caracas fare package. (*See* Order 70–2–124 at 2 n. 4 and accompanying text.) In pertinent part, this latter order accepted the examiner's conclusion that the CBIT and California Proportional fares were not adverse to the public interest or violative of the Act, but rejected his determination that the elimination of the round-trip discount should be disapproved. On March 4, 1970, the petitioners in the present action filed a petition to review the Board's two February 27 orders; that petition has been docketed as case No. 23,988, and has not as yet been scheduled for oral argument.

We do not believe that any of these events subsequent to the bringing of this action have mooted any of the issues presented in this petition. As will be developed more fully below, the petitioners' basic ground of complaint is that the Board improperly cut off the supplemental carriers' antitrust rights by granting approval (whether full or interim) to the IATA fare agreement without holding a necessary evidentiary hearing or making sufficient findings of fact. If this contention is correct, then the supplemental carriers may have viable claims for relief under the antitrust laws which accrued during the period of time in which the Board's April 30 order purported to bar those rights,[4] or ground for seeking further relief before the agency regarding the still-effective elements of tariffs filed pursuant to the original agreement. *Cf.* 49 U.S.C. § 1381 (1964). Therefore, we proceed to an examination of the merits of petitioners' arguments.[5]

4. In light of the present posture of this action, we intimate no view as to whether the petitioners do in fact have viable antitrust claims consistent with Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), Allied Air Freight, Inc. v. Pan American World Airways, 393 F.2d 441 (2d Cir.), cert. denied, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968), and similar cases. This question would have to be resolved in the context of any later antitrust action that the petitioners might elect to bring.

5. *See* Bebchick v. Public Utilities Commission, 115 U.S.App.D.C. 216, 218–219, 318 F.2d 187, 189–190 (*en banc*), cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963), where we stated:

A rate order such as the one before us is not mooted by another one which has the effect of keeping the controversy alive. * * * [T]he validity of the order * * * during the time it was in effect before it was superseded, remains in controversy; for the disposition of any excess funds which might have accumulated * * * by reason of the invalidity of the increase, remains for decision. So we hold that the case is not moot.

It is also significant that the Board limits approval of IATA agreements to two years, and that the effectiveness of an agreement can in some circumstances be abrogated by the action of member carriers. The Supreme Court dealt with a similar problem in rejecting a suggestion of mootness in Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911):

[T]he order * * * may to some extent (the exact extent it is unnecessary to define) be the basis of further proceedings. But there is a broader consideration. The questions involved in the orders of the Interstate Commerce Commission are usually continuing * * * and their consideration ought not to be, as they might be, defeated, by short term orders, capable of repetition, yet evading review, and at one time the Government and at another time the carriers have their rights

## III. THE BOARD'S POWER TO GRANT INTERIM APPROVAL

The question of whether the Civil Aeronautics Board has the power under section 412 of the Act to approve an agreement for less than the full term of its effectiveness appears to be a question of first impression in the courts, although the Board has employed this device on several other occasions.[6] The relevant portions of section 412 of the Act, 49 U.S.C. § 1382(b) (1964), offer little guidance, since they merely speak in terms of outright rejection or full approval:

> The Board shall by order disapprove any such contract or agreement * * * that it finds to be adverse to the public interest, or in violation of this chapter, and shall by order approve any such contract or agreement * * * that it does not find to be adverse to the public interest, or in violation of this chapter. * * *

Reviewing courts, however, have generally declined to construe this provision rigorously or literally, out of concern for the Board's need to retain some procedural flexibility in administering an area replete with conflicting interests, international implications, and frequent pressure to act expeditiously. Thus, the Second Circuit has upheld the Board's assertion of a closely parallel power, the authority to grant conditional approval under section 412:

> Nor is the Board bound to approve or disapprove agreements in their entirety. It is true that § 15 of the Shipping Act of 1916, 46 U.S.C.A. § 814, on which § 412 of the Civil Aeronautics Act was modeled, provides that

the Federal Maritime Board may "disapprove, cancel, or modify any agreement," whereas § 412 says only that the Board may "by order disapprove." However, the power to condition its approval on the incorporation of certain amendments is necessary for flexible administrative action *and is inherent in the power to approve or disapprove.* We would be sacrificing substance to form if we held invalid any conditional approval but affirmed an unqualified rejection accompanied by an opinion which explicitly stated that approval would be forthcoming if modifications were made.

McManus v. CAB, 286 F.2d 414, 419 (2d Cir. 1961) (emphasis added); *cf.* National Aviation Trades Ass'n v. CAB, 136 U.S.App.D.C. 367, 380, 420 F.2d 209, 222 (1969).

■ We think that there are valid reasons to conclude that the power to grant approval for a limited time is similarly inherent in section 412 of the Act. The primary need for such a power arises in a situation where, as in the present case, an attempt is made to introduce novel elements into the fare structure; when this occurs, the Board simply may not have enough factual information to make the kind of determination under the public interest standard that would warrant approval for the full term of the agreement, even though the innovation possesses some obvious advantages. In the present case, the Board's April 30 order explicitly takes note of this rationale with respect to the CBIT fares, pointing out that "limited approval will permit some experience to be gained with respect to both the generative aspects of the fares and their

---

determined by the Commission without a chance of redress.
The *Southern Pacific Terminal* case was recently cited with approval in Carroll v. President & Commissioners of Princess Anne, 393 U.S. 175, 178–179, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968).

6. *See* IATA Joint Conference Agreements Relating to Fares via the North Atlantic, Order No. E–24,823 (March 6, 1967);

IATA Agreement Relating to Fare Matters, Order No. E–24,577 (Dec. 29, 1966); IATA Agreement Relating to Travel Agents, Order No. E–21,726 (Jan. 27, 1965); IATA Resolution Relating to Passenger Sales Agency Rules, Order No. E–21,727 (Jan. 27, 1965). None of these orders cites any authority or offers any analysis in support of the existence of the power to grant interim approval.

impact upon the supplemental carriers." (App. 258.) In addition, some types of fares apparently require a considerable amount of lead time for adequate preparation by concerned parties before the new service can be offered to the general public; the device of interim approval can provide needed short-term predictability to permit implementation of such arrangements.[7]

There are, however, several theoretical and practical difficulties inherent in the interim approval device. Conceptually, anything short of approval for the entire term of the agreement could be characterized as "interim," perhaps with a view toward persuading a reviewing court to look more leniently at the rationale supporting a given order than it would if the approval purported to be plenary. Moreover, the Board's description of interim approval as *"pendente lite"* should not be allowed to obscure the fact that action taken under section 412 operates with finality to invest the agreement with immunity to the antitrust laws; for this reason, it is possible that even interim approval would have a serious impact upon those adversely affected by anti-competitive features in an agreement. Obviously, what is called for is a careful balancing of the gravity and duration of the harm likely to be inflicted upon the protesting parties against the benefits flowing from approval for the short period.

## IV. THE NEED FOR A HEARING

Petitioners also contend that the Board erred in basing its April 30 order upon pleadings, documents, and oral argument rather than a full evidentiary hearing. This assertion is made in spite of the absence of any hearing require-

ment in section 412, and in spite of the fact that several judicial decisions have explicitly noted this omission. *See* Fugazy Travel Bureau, Inc. v. CAB, 121 U.S.App.D.C. 355, 350 F.2d 733 (1965); Railway Express Agency, Inc. v. CAB, 120 U.S.App.D.C. 228, 345 F.2d 445, cert. denied, 382 U.S. 879, 86 S.Ct. 162, 15 L.Ed.2d 120 (1965); McManus v. CAB, 310 F.2d 762 (2d Cir. 1962). However, none of these cases can be considered dispositive of the issue presently before us; and petitioners urge that in the circumstances of this case, the Board was required to hold an evidentiary hearing.

Petitioners' argument for a hearing is based upon principles gleaned from a number of recent administrative law decisions, principles which can be summarized in the statement that the need for an evidentiary hearing is particularly acute when the issue presented is one which possesses great substantive importance, or one which is unusually complex or difficult to resolve on the basis of pleadings and argument. *See* generally Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 17–18, 420 F.2d 577, 585–586, n. 22, 589 n. 36 (1969); Citizens for Allegan County, Inc. v. FPC, 134 U.S.App.D.C. 229, 232–233, 414 F.2d 1125, 1128–1129 (1969); Trailways of New England, Inc. v. CAB, 412 F.2d 926 (1st Cir. 1969).

The petitioners assert that their antitrust allegations satisfied both of the above criteria. With respect to the substantive importance of their antitrust claim, they rely heavily on the *Trailways of New England* case. There the First Circuit reversed the Board's decision to dismiss without investigation a complaint which charged that certain tariffs were unduly discriminatory, stating:

---

7. This is not to say that the Board should allow itself to be pre-empted by the effective date of a given agreement; for example, the fact that IATA has some leeway to make the threat of an open rate situation imminent rather than remote (*see* note 1, *supra*) does not relieve the Board of its responsibility to make an adequate appraisal of the public interest

under section 412 of the Act. However, considerations like the foregoing are more pertinent to the question of whether it was proper for the Board to grant interim approval in a given case than to the question of whether the power to grant interim approval should be deemed inherent in section 412.

While [49 U.S.C. § 1482(a)] * * * allows for dismissal without hearing when the Board "is of the opinion that any complaint does not state facts which warrant an investigation," we do not believe, at least as to claims of discrimination and preference, but not necessarily as to other kinds of complaints, * * * that the dismissal provision vests anything near absolute discretion in the Board.

412 F.2d at 931–932. The Board's own prior decisions also support the assertion that colorable antitrust claims should be considered substantively important. In IATA Credit Agreements, 30 C.A.B. 1553, 1554–1555 (1960), the Board ruled that when IATA resolutions appear on their face to be repugnant to antitrust principles, they cannot be approved under section 412 "unless their proponents have made a clear showing of the need for approval to fill [a] serious transportation need or secure important public benefits." This principle has been an established aspect of the Board's regulatory policy since the Local Cartage Agreement Case, 15 C.A.B. 850, 853 (1952). Moreover, in Volumair Agreement, 30 C.A.B. 1007, 1008 (1960), the Board specifically noted the relationship between the need for a hearing under section 412 and the likelihood that the agreement in question would alter the competitive roles of the scheduled and supplemental carriers. Finally, with respect to the complexity of the issues raised, we have recently noted that "summary procedures are held to have only limited scope in antitrust litigation," particularly when there is a question of predatory intent as in the present case. Citizens for Allegan County, Inc. v. FPC, *supra*, 134 U.S. App.D.C. at 232–233, 414 F.2d at 1128–1129.

To avoid the full impact of these authorities, the Board advances three primary arguments: the need to act expeditiously because of the threat of an open rate situation; the similarity of some of the fares contained in the agreement to fares which the Board had previously considered; and the fact that the public would generally benefit from lower prices under the new fares. Each of these contentions has some merit, but each also has some difficulties. The fact that the existing fare agreement was about to expire when the Board was considering whether to schedule an evidentiary hearing on the new resolution obviously had some impact on its choice of procedures,[8] and certainly the maintenance of amicable international relations concerning air transportation is consistent with the Board's regulatory objectives. However, the Board is still required to make an informed assessment of the public interest under section 412, and the specter of an open rate situation does not absolve the Board of its responsibility to employ procedures which will allow it to discharge the task adequately. This duty was admitted by the Board in IATA Agreements re Passenger Fares, 38 C.A.B. 1062, 1063 (1963):

The Board is concerned with the apparent view that this government is acting unilaterally to achieve its objectives; that, since IATA agreements represent a compromise of many rating philosophies and interests of different carriers and their governments, no one government can expect to achieve its total objectives and therefore should seldom take any action which would be disruptive of IATA agreed fares. To abrogate the right to disapprove an IATA agreement on the basis of its disruptive effects would reduce government review

---

8. *See, e. g.*, the Board's April 4 order (App. 201), where it stated:

[I]n light of the considerable controversy surrounding the agreement the Board has concluded that the public interest warrants setting the matter for oral argument. Since we are herein setting oral argument, and in view of the relatively short period of time available for consideration of the agreement, we do not believe a further extension of procedural dates would serve a useful purpose.

to a perfunctory exercise negating any need for review. The Board has no recourse but to disapprove agreements it considers to be inconsistent with the public interest not only from the standpoint of policy, but [also] in the discharge of its statutory obligations. * * *[9]

Thus, while the Board is free to ascribe some weight to the international overtones of an agreement, it obviously cannot allow these considerations to become determinative.

The Board's prior experience with similar group fares is also less than completely reassuring. In IATA Agreements re Passenger Fares, 38 C.A.B. 1062, 1073–1074 (1963), the Board expressed serious concern about the discriminatory aspects of affinity group fares:

> The affinity restriction itself represents a very substantial restriction [on the availability] of these fares to the general public. * * * [W]e will not be prepared to approve such restrictions indefinitely. Stated differently, we believe the public interest requires that these fares eventually be made available to all groups whether or not the members have some affinity with one another.

More recently, in dealing with domestic GIT fares, the Board stated its conclusion that "proposed round-trip inclusive tour basing fares applicable to groups of 40 or more passengers may be unjust or unreasonable, unjustly discriminatory, or unduly preferential, or otherwise unlawful, and should be investigated." Because of the possibility that these GIT fares would adversely affect competing carriers, the Board suspended their effectiveness pending investigation. Group Inclusive Tour Basing Fares to Hawaii, Order No. 68–12–144 (Dec. 20, 1968) (slip op. at 3).

However, these isolated excerpts from prior Board decisions demonstrate little more than the fact that group fares have some discriminatory and anticompetitive aspects, and that the Board knew of these tendencies. They do not bear upon what would seem to be a more pertinent inquiry in the present case: that is, the effect that approval of these fares would have in the currently prevailing market situation. The record on appeal contains some indications that economic conditions in the industry could change radically with the introduction of the huge Boeing 747 jet aircraft. This new airplane, which was scheduled to go into service during the term of the agreement here in issue, has a vastly greater seating capacity than its predecessors, and thus it should markedly intensify the competition between the supplementals and the scheduled carriers for passengers; at the same time, the substantial initial costs incurred by car-

---

9. *But cf.* Brief for the Respondent at 27–28: "The agreements fixing international rates represent a compromise of the rate-making philosophies and interests of the different carriers and their governments, and this nation cannot unilaterally impose its will upon the other nations through an application of the antitrust laws. * * *" If the foregoing statement is intended to indicate a reversal of the Board's prior policy, this shift apparently has not been communicated to the hearing examiner who conducted the investigation of the CBIT fares and the elimination of the round-trip discount. In his initial decision, the examiner stated:

> [TWA] would have the Board grant superior weight to the fact that the fare resolutions are the product of

lengthy negotiations among the IATA carriers reflecting compromise. * * *

While the extra-economic aspects of the IATA fare resolution may warrant consideration, TWA has not made a convincing showing that they should receive controlling weight. *Cf.* IATA Agreements * * * 38 C.A.B. at 1063, 1069. Clearly the "just and reasonable" criteria are fundamental ingredients in the process of evaluating what is or is not adverse to the public interest. Section 102 so provides.

(Initial Decision at 22.) The April 30 order presently under review contains no pertinent discussion of the weight that should generally be ascribed to the international relations factors bearing on an IATA agreement.

riers purchasing these aircraft may well increase the possibility that a slight worsening of one or more carriers' competitive positions would have a far-reaching impact on the structure of the industry. In a parallel situation, where new group fares were introduced at a time when large-capacity jet aircraft were first being brought into service, the Board undertook a careful economic analysis of the competitive impact of the new fares, and set forth detailed findings in support of its approval. IATA Group Fares Agreement, 36 C.A.B. 33 (1962).

In short, the essential question, from an antitrust standpoint, is whether the existence of a market structure conducive to maximum feasible competition will be imperiled by approval of the agreement. "Furtherance of the economic or policy implications of the agency's particular statutory charter may indeed compel overriding of antitrust principles,"[10] but first the proper antitrust questions must be asked and answered. Thus it is not really responsive to an antitrust claim, except perhaps as a counterbalance to the projected anticompetitive effects, to say that an agreement will provide the public with lower fares, if there is a risk that these lower fares are merely a step toward an ultimate increase in concentration. Price cutting, after all, is a time-honored tool of the aspiring monopolist.

■ The fact that these questions are difficult and important, however, does not mean that an evidentiary hearing is an essential prerequisite to their satisfactory resolution. Much, if not most, of the needed information obviously could have been submitted in documentary form, with briefs and oral argument addressed to the inferences to be drawn from the raw data. The questions of predatory intent, which in general are particularly suited to exploration in a trial-type hearing, quite possibly could have been resolved on the basis of sub-poenaed documents and the minutes of the relevant IATA conferences. We have noted above that section 412 of the Aviation Act does not contain a hearing requirement; yet, in construing similar statutes containing hearing requirements, we have attempted to avoid imposing rigid limitations that would narrow the agency's latitude in choosing which procedures are best suited for resolving a given issue in the context of a particular case. See Marine Space Enclosures, Inc. v. FMC, *supra*, 137 U.S. App.D.C. at 21–22, 420 F.2d at 589–590. Therefore, we hold that the Board did not commit reversible error by refusing to schedule an evidentiary hearing on the petitioners' antitrust allegations.

## V. SUFFICIENCY OF THE BOARD'S FINDINGS

What we have said in the preceding sections serves to delimit the contours of our inquiry into the adequacy of the Board's findings. First, our sanction of the interim approval procedure, and the rationale underlying it, suggest that the assessment of the Board's findings should be bifurcated, with different standards applied to the findings relating to full and interim approval. That is, the fact that interim approval is useful primarily in situations in which the Board needs to act expeditiously in order to preserve certainty in the industry, but lacks sufficient information to determine authoritatively whether the agreement as a whole will serve the public interest, indicates that our review of the findings supporting the interim approval should be relatively limited. Since the Board in electing to order an interim approval is essentially saying that the agreement, or a portion of it, has both good and bad features on its face, and that examination of further data gleaned from practical experience is necessary to an enlightened determination of the public interest, a reviewing court can do little more than ask

---

10. Cities of Statesville v. AEC, No. 21,706 (D.C.Cir. Dec. 5, 1969) (en banc) (slip op. at 45; Judge Leventhal, concurring).

whether this conclusion is reasonable and based upon substantial evidence. As we noted in section III of this opinion, a significant aspect of the reasonableness of a decision to grant interim approval is the extent and duration of the harm likely to be inflicted upon the opponents of the agreement, in relation to the potential public benefits flowing from approval.

Our discussion in section IV concerning the inherent substantive importance and complexity of antitrust issues also affects the nature of our review of the findings needed to support full approval in the face of nonfrivolous allegations that the agreement will have significant anticompetitive effects. Since we have repeatedly stated that these issues are particularly suited to resolution by evidentiary hearing, it must follow that disposition of antitrust questions by other means creates a greater likelihood of administrative error, and invites a more skeptical judicial scrutiny. While the exigencies of an agency's regulatory obligations or the peculiar nature of a given factual situation may dictate that antitrust questions be treated in a manner divergent from the norm, there can be no doubt that these issues are complex, requiring painstaking assessment of many relevant considerations, and that sound analysis must begin with an adequate factual input. To state the governing principle another way, we point out that judicial review is conducted on the basis of the record as a whole, so that rather conclusory findings can frequently be redeemed by resort to a detailed factual record; this is not often possible, however, when the fact-finding procedure employed is only marginally adequate in relation to the difficulty and importance of the questions presented.

 Turning, then, to the findings contained in the April 30 order, we begin with the observation that "[o]n review nothing is clearer than the principle that we examine the Board's reasons

and not the subsequent rationalizations of its counsel." Trailways of New England, Inc. v. CAB, 412 F.2d 926, 931 (1st Cir. 1969). In discussing the CBIT fares,[11] the April 30 order points out that they are "an entirely new concept of marketing," and that practical experience is needed to assess both their usefulness as a promotional tool and their economic impact on the supplemental carriers. (App. 258.) The order also accords some weight to the probability that the low level of the CBIT fares will "enable many persons to travel by air who would not otherwise be able to use air transportation," and concludes that the public interest would best be served by limited approval pending an expedited investigation. (Id.) We conclude that this analysis is adequate, consistent with the rationale underlying interim approval, and supported by substantial evidence.

In dealing with the elimination of the round-trip discount, the April 30 order first takes note of the possibility that this increase could act as a subsidy for uneconomical fares in the competitive charter market. On the other hand, the decision points out, the currently available cost data showed a marked discrepancy in the rates of return experienced by the two major American scheduled carriers. The order notes that this uncertainty is compounded by the question of what impact increasing cost inflation is having on the scheduled carriers, and the existence in the record of data tending to indicate that the fare increase would be generally offset by the public's savings from the greater availability of excursion and individual inclusive tour fares. (App. 257–258.) We find that this analysis is also sufficient to support a grant of interim approval.

The findings relating to the fares approved for the full term of the agreement are much more cryptic and conclusory. In discussing the Incentive Group fares, the order characterizes them as "new" and "troublesome because of their

---

11. As previously noted, the Board considered the California Proportional fares as part of its inquiry into the CBIT's. See note 2, supra.

discriminatory aspects," and then simply concludes without explanation (App. 262):

> The Board would have no difficulty if the resolution is broadened to correspond with group travel fare provisions applicable via the North/Central Pacific which provides that the travel group may be formed for "own use of one person", including an individual person or legal entity.

The treatment of the GIT and Affinity Group fares is even more summary, for, aside from the initial description of them, the only portion of the order which could be considered a relevant finding is the pro forma declaration that "[t]he Board has considered all of the allegations raised by the parties, including those not specifically adverted to herein, as well as all matters bearing upon the agreements, and concludes that they are consistent with the public interest and should be approved." (App. 263.) There is absolutely no attempt to relate these fares to the current or projected market situation, and no indication of how their anticompetitive aspects may be outweighed by public benefits; yet, as we noted above, the Board's most recent prior assessment of a group fare cited by any of the parties resulted in the conclusion that the fare's anticompetitive potential demanded suspension and investigation of the tariffs. Group Inclusive Tour Basing Fares to Hawaii, Order No. 68–12–144 (Dec. 20, 1968). "An agency may modify or even reverse its past policies * * * but the confidence of a reviewing court that these adjustments are made in accordance with the requirements of law is not enhanced when the prior precedents are not discussed, the swerves and reversals are not identified, and the entire matter is brushed off once over lightly." Marine Space Enclosures, Inc. v. FMC, *supra*, 137 U.S.App.D.C. at 17, 420 F.2d at 585.

The Board asserts that these group fares are "time-honored elements of the fare structure," and that it should not be required to engage in a meaningless and repetitious exploration of ground it has covered long ago. However, a perusal of the Board's prior orders dealing with similar fares—none of which is relied upon in the April 30 order—indicates that this argument oversimplifies the problem considerably. In 1962, when the IATA carriers introduced affinity group fares into the North Atlantic market over the protests of the supplementals, the Board approved the agreement in an order which included detailed findings[12] and careful analysis

---

12. The following findings offer an example of the kind of careful consideration which the Board afforded the economic data in IATA Group Fares Agreements, 36 C.A.B. 33 (1962):

> [T]here has been a growing condition of excess capacity over the North Atlantic, associated in major part with the acquisition by the scheduled carriers of large capacity jet aircraft. * * * [T]he seats operated by the scheduled IATA air carriers over the North Atlantic [between 1959 and 1961 experienced] * * * an increase of 80 percent, whereas passengers increased * * * only 37 percent. As a result, the average seat factor declined from 66.1 percent in 1959 to 50.3 percent in 1961, which is believed to be the lowest seat factor in the history of commercial air transportation across the Atlantic. [36 C.A.B. at 35.]
>
> * * * * *

> [F]or the year 1961 Pan American had a return on investment of only 1.2 percent on its Atlantic sector. A worse situation existed with respect to TWA, which had an operating loss of $1,768,000. * * * [36 C.A.B. at 35.]
>
> * * * * *
>
> [W]hereas in 1958, charter travel constituted only 6.5 percent of all individually paid transatlantic travel, in 1961 it accounted for 14.2 percent of the total. In recent years, approximately 80 percent of these charters was [*sic*] performed by the IATA carriers. * * [36 C.A.B. at 36.]
>
> * * * * *
>
> * * * Pan American forecasts a seat factor of 59.6 percent for the period May to October 1962 without group fares and a seat factor of 68.7 percent with group fares. * * * Similarly, TWA forecasts a net revenue gain of

of both the discriminatory aspects inherent in the fares and the fares' impact on the relative market positions of the supplementals and IATA carriers. IATA Group Fares Agreements, 36 C.A.B. 33 (1962). That the analysis should proceed along these generally bifurcated lines is suggested not only by general antitrust principles, but also by the primary reasons which the Board has advanced for allowing supplemental carriers to enter the North Atlantic market: (1) providing a mix of transportation services through different kinds of fares, together with assuring sufficient aircraft capacity to accommodate peak season traffic; and (2) creating a spur to improved service and prices for the traveling public through competition. *See generally* Transatlantic Charter Investigation, 40 C.A.B. 233 (1964).

██ The first of these inquiries— whether the fares themselves are so inherently discriminatory as to merit condemnation under the public interest standard—is certainly an area in which it is proper and desirable for the Board to employ the expertise which it has gained in past investigations of identical or similar fares. This kind of expertise may well be applicable to the group fares presently in issue, although the Board's more recent decisions do not point overwhelmingly to a finding that these fares are nondiscriminatory. Thus, in IATA Agreements Relating to Fares via the North Atlantic, Order No. E–24,823 (1967), the Board stated that

"the extent [to which] the new group fares will be used and their effects on the overall fare structure are by no means clear at this time." (Slip op. at 5.) There the Board reasoned that "[t]he tie-in feature [of the group inclusive tour fares] with the purchase of ground accommodations does not seem to be an unreasonable one *in view of the considerable discount these fares provide from normal and other fares*." (*Id.*; emphasis added.) In the present fare agreement, the IATA carriers have admittedly strengthened the tie-in features of the GIT fares (*see, e. g.*, App. 29–30), and have increased the fare levels, yet the April 30 order makes no attempt to relate these changes to the other elements of the new fare package. In its treatment of the question of discriminatory effect in the 1967 order, the Board also placed considerable reliance on the fact that the group inclusive tour-basing fares were "available to all persons," stating: "There are no restrictions based on the characteristics of status of the user, *i. e.*, occupation, club membership, etc." (IATA Agreements, *supra*, slip op. at 5.) Here, the Board has approved without analysis two fares, the incentive group and affinity group fares, which ostensibly fit within these proscribed classes. Finally, in the 1967 order the Board reasoned that "[i]n the long run, additional volumes of traffic [generated by the group inclusive fares] will afford a broader base over which to spread costs and should enhance the pos-

almost $4 million. These forecasts have not been challenged in any significant respects, and on the basis of our analyses, they appear to be attainable. [36 C.A.B. at 37.]

\* \* \* \* \*

[W]e are unable to find that the group-fare resolution was motivated by a predatory intent to eliminate non-IATA competition. The record establishes a primary design to (1) tap new traffic sources, and (2) eliminate the economic waste involved in the carriage of passengers on IATA carrier charters while the same carrier's scheduled flights are carrying empty seats. \* \* \*

\* \* \* [A] diversion of charter traffic to scheduled services will \* \* \* have its greatest impact on IATA charters. \* \* \* Finally, the total number of passengers carried by the [supplemental] charter operators is small in relation to all transatlantic travel (about 2 percent of the total), and the threat posed to the non-IATA carriers is thus relatively *insignificant, especially* when viewed in the light of the other economic problems faced by those carriers. [36 C.A.B. at 38.]

sibility of lower normal fares." (*Id.*) This rationale seems to have lost some persuasiveness in view of the fare increases sought in the present case, although we realize that other factors could have overborne any such price-lowering effect; the essential point, however, is that the April 30 order does not address itself to these problems, and in consequence we have no rational basis for choosing among the conflicting inferences. It is also significant that, so far as we have been able to determine, Board approval of these kinds of group fares has not yet withstood review by the courts, and that questions of discrimination deserve close judicial scrutiny predicated upon a careful administrative analysis. As the First Circuit has observed, "not only is the right to be treated fairly and nondiscriminatorily by a common carrier an expression of the pervasive precept of fairness between government and governed that runs through American jurisprudence, it is one derived from the common law of common carriers." Trailways of New England, Inc. v. CAB, 412 F.2d 926, 931 (1969); *see also id.* at 932–936; Transcontinental Bus System, Inc. v. CAB, 383 F.2d 466, 485 (5th Cir. 1967), cert. denied, 390 U.S. 920, 88 S.Ct. 850, 19 L. Ed.2d 979 (1968): "The rule of equality is the very core and essence of the fare structure in the transportation industry, and it should not be rendered a meaningless phrase by the use of spurious justifications for unjustly discriminatory fares."

With respect to the second line of antitrust inquiry—the impact of the fare changes on the current market structure—the lack of analysis in the April 30 order is even more troublesome. The record contains numerous suggestions that competitive relationships within the industry and the market could change rapidly and substantially as a result of the increased capacity of the new 747 aircraft, yet the April 30 order mentions this technological impact only in describing changes in the fare schedules which

establish new seating configurations. (App. 257.) A similar situation ostensibly existed when jet airplanes first replaced the smaller piston aircraft in the North Atlantic market, and, when the IATA carriers changed their fare structure in this context, the Board carefully examined the available economic data in light of the changing conditions, making detailed findings and estimates. (*See* note 12, *supra.*) The Board suggests that, at least in regard to the GIT fares, concern about anticompetitive effects is unwarranted because these fares were raised rather than lowered by the IATA resolution. However, petitioners assert in their brief that most of the supplementals' civil charter business falls into three fare categories: (1) pro rata charters, in which an organization charters an aircraft for the use of its members, who then divide the cost among them; (2) single entity charters, in which a business or other organization charters an aircraft at its own cost; and (3) inclusive tour charters, in which a tour operator charters the aircraft for use in a package tour which is marketed to the general public. (Brief for the Petitioners at 7.) Thus, depending upon the degree of cross-elasticity of demand which exists among the various kinds of fares presently in issue—a factor which is not adequately treated in the record or the April 30 order—it may be that the GIT fare constitutes a "monopoly" market for the IATA carriers in the same sense that regularly-scheduled service does; thus, the attempt to raise these fares, in conjunction with the decision to enter the bulk inclusive tour market for the first time with fares that are allegedly unreasonably low, would seem to give rise to the same kinds of dangers that led the Board to schedule a further investigation of the elimination of the round-trip discount.

Furthermore, we cannot find redeeming support for the Board's conclusions on the three group fares by resorting to the record as a whole. The record on appeal consists primarily of

unenlightening fare tables, uncollated economic data, and unresolved arguments and counterarguments; it raises more questions than it answers. In short, the Board's treatment of the three group fares has "crossed the line from the tolerably terse to the intolerably mute." WAIT Radio v. FCC, 135 U.S. App.D.C. 317, 321, 418 F.2d 1153, 1157 (1969). A more lucid and careful explication of the relevant factors is needed before an agreement can be immunized from the operation of the antitrust laws for a period of two years, in the face of substantial antitrust questions. Accordingly, we reverse the Board's April 30 order with respect to the Affinity Group, Incentive Group, and Group Inclusive Tour fares.

## VI. SCOPE OF THE DECISION

In order to avoid any possible confusion regarding the extent of our holding, it may be useful to compare today's decision to the similar but distinguishable factual situation which recently confronted this court in Pennsylvania Gas & Water Co. v. FPC, 138 U.S.App.D.C. 298, 427 F.2d 568 (March 19, 1970). In *Pennsylvania Gas*, we vacated an order of the Federal Power Commission which granted temporary approval without hearing to an anticompetitive agreement between two gas companies. The contrasts between that situation and the facts of the instant case are multiple and significant. In *Pennsylvania Gas*, the relevant statute required notice and hearing on all applications for certificates permitting coordinated operations, with a specific and narrowly drawn exception for emergencies; section 412 of the Aviation Act, on the other hand, requires no evidentiary hearing as a prerequisite to approval of fare resolutions which by their nature are price-fixing agreements. We found that the facts which the Federal Power Commission characterized as an emergency in *Pennsylvania Gas* did not fall within the "narrow class of situations" contemplated by Congress as valid occasions for invocation of emergency authority to avoid both notice and hearing. (138 U.S.App. D.C. at 304, 427 F.2d at 574.) We see nothing in the language, legislative history, or underlying policy of section 412 to indicate that the Board's use of interim approval power in the instant case conflicts with Congressional intent.

The practical considerations inherent in the two factual situations also point toward opposite results. In *Pennsylvania Gas* we observed that the "coordinated operations" approved by the Commission would be the functional equivalent of a merger (138 U.S.App.D.C. at 307, 427 F.2d at 577), and that "[e]ven assuming it may be possible to disregard or undo the temporary operation the regulatory difficulties involved in any unscrambling may be sufficient to give the temporary certificate a momentum that is as meaningful in fact as it is unwarranted in law." (138 U.S.App.D.C. at 305, 427 F.2d at 575.) The fare agreement presently in issue is limited in duration, and the interim approval is operative for an even shorter period of time; moreover, it comes at the end of a period in which the supplemental carriers have experienced robust economic growth. The threat that improper approval will have irreversible economic consequences seems much more remote in this situation. Even if interim approval generally creates some momentum toward authorization for the full term of the agreement—an argument which is partially contradicted by the holding of the December 11 initial decision in the present case—the Board's decision will, as we have indicated in part IV of this opinion, have only limited effect even as administrative stare decisis because of the need to re-evaluate the evolving market structure in relation to fare packages which are adopted later.

Another practical distinction between the two cases arises from the alternatives which were available to the respective agencies. We expressed serious concern in *Pennsylvania Gas* that the Commission had ignored the possibility

that less drastic alternative solutions to the problem could be developed, and instead had authorized "broad changes in operation" which seemed to extend "far beyond the exigencies of urgent need." (138 U.S.App.D.C. at 307, 427 F.2d at 577.) On the other hand, the decision to grant interim approval to the IATA fares pending expedited investigation can be viewed as a reasonable compromise solution to the dilemma which confronted the Civil Aeronautics Board: either schedule evidentiary hearings prior to approval, with the virtual certainty that this would create an open rate situation, or attempt to determine the propriety of full-term approval in the limited time and with the limited information then available. Neither choice would have provided the input of factual data created by a short period of actual experience with the new fares; and, on the basis of the record presently before us, we cannot say with any certainty here, as we did in *Pennsylvania Gas*, that the need to act expeditiously was precipitated by the manipulations of those who sought approval of the agreement. *See Pennsylvania Gas*, 138 U.S. App.D.C. at 307, 427 F.2d at 577; notes 1 and 7, *supra*. Thus, in the rather unusual circumstances presented by this case, we think that the Board's decision to grant interim approval was reasonable and consistent with governing authority.

A final question remains with respect to the relief sought by petitioners. In their briefs, the petitioners ask that the cause be remanded to the Board for further proceedings. However, the subsequent events detailed in part II of this opinion make it clear that a remand would serve no useful purpose in light of the expiration of the underlying agreement and the pendency of another series of proceedings looking toward approval of the new IATA resolutions. Therefore, we merely hold today that the Board's approval of the three group fares was improper, and must be reversed.

Affirmed in part and reversed in part.