AIR LINE PILOTS ASSOCIATION, IN-
TERNATIONAL, Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent.

No. 71–1751.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 14, 1972.

Decided Jan. 4, 1973.

Mr. Gary Green, Washington, D. C., with whom Mr. J. Raymond Needham, Washington, D. C., was on the brief, for petitioner. Mr. Arthur A. Horowitz, Washington, D. C., also entered an appearance for petitioner.

Mr. Warren L. Sharfman, Associate Gen. Counsel, Litigation and Research, C. A. B., with whom Messrs. R. Tenney Johnson, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, Robert L. Toomey, Alan R. Demby, Attys., C. A. B., and Howard E. Shapiro, Atty., Dept. of Justice, were on the brief, for respondent.

Before BAZELON, Chief Judge, DANAHER, Senior Circuit Judge, and FRANK A. KAUFMAN,* United States District Judge for the District of Maryland.

* Sitting by designation pursuant to 28 U.S.C. § 292(c) (1970).

BAZELON, Chief Judge:

Petitioner Air Line Pilots Association [1] challenges CAB approval of an agreement, pursuant to Section 412 of the Federal Aviation Act of 1958, 49 U.S.C. § 1382, providing for multi-lateral reduction of scheduled seating capacity in four major domestic markets. Petitioner contends that the Board was required to hold a hearing because of the anti-competitive aspects of the agreement; that the Board was required to hold a hearing because of the impact on carrier employees in order to determine whether labor protective provisions should be applied to the agreement; and that, in the absence of such hearings, the Board's findings are insufficient and unsupported by the record.

We hold that the Board was not required to hold a hearing with respect to the anti-competitive aspects of the agreement. However, we are unable to determine the basis on which the Board denied a hearing on the impact of the agreement on carrier employees; since we will not construct a proper justification here, we remand to the Board for a new determination.

*The Agreement*

In 1970 American Airlines, Inc. (American), Trans World Airlines, Inc. (TWA), and United Airlines, Inc. (United) were experiencing heavy financial losses due in substantial part to excess seating capacity in many major domestic routes. The excess capacity was caused by a decline in the traffic levels and the introduction of large, higher capacity aircraft. Efforts at unilateral reduction· appear to have failed to alleviate the excess both because of the magnitude of the problem and the traditional fear of each carrier that unilateral reduction would lead to a loss of the carrier's market share.[2]

Section 412 of the Federal Aviation Act of 1958 gives to the CAB authority to approve agreements among carriers "for controlling, regulating, preventing, or otherwise eliminating destructive, oppressive or wasteful competition, or for regulating stops, schedules, and charter of service. . . ." Board approval confers anti-trust immunity by virtue of Section 414 of the Act.[3]

In August of 1970, American, TWA and United entered into such an agreement providing for multi-lateral reduction of scheduled seating capacity in 15 markets for a two year period in the hope of stemming financial losses. While the Board disapproved this particular agreement,[4] it suggested that it "would be prepared to consider applica-

1. Air Line Pilots Association is the certified bargaining representative of flight crew members of a number of air carriers, representing over 15,000 pilots, stewards and stewardesses employed by United and TWA.

2. In 1970, TWA, United, and American incurred losses of $65 million, $40 million, and $26 million respectively. Between 1970 and 1971 the carriers reduced the number of flights in the four markets by 13%; however, there was still a 13% increase in non-stop capacity. The overall load factor dropped by 19% to 32%, well below levels considered sound by the CAB. Application of TWA et al, Order 71-8-91, August 19, 1971.

3. Section 412 [72 Stat. 770, 49 U.S.C. § 1382]; Section 414, [72 Stat. 770, 49 U.S.C. § 1384].

4. *See* Agreement between American, TWA and United, Order No. 70-11-35, November 6, 1970. Among other things, the Board found that the two year period was too long and the agreement was too flexible. Under the proposed agreement, the airlines were not required to reduce capacity in any specific market as long as the total capacity was reduced in the aggregate of the markets. "Given the extremely competitive history of the carriers in such major markets as New York-Los Angeles, for example, it is highly possible that the carriers would choose to maintain their competitive pressures in these markets and comply with their agreement by reducing service in their two-carrier markets (e. g., Memphis-Los Angeles) or in satellite-type markets (e. g., Newark-San Jose). In such later instances, satellites like Ontario or San Jose could lose the relatively little transcontinental service they now have." *Id.*

tions for authority to engage in discussions, under the appropriate safeguards, looking toward multilateral agreements to reduce capacity in markets in which excess capacity is presently being operated."[5] The Board agreed that the severe economic plight of the carriers was due in large part to overcapacity being operated in many large markets.

The respondents applied for, and the Board approved, discussions which led to an agreement on June 21, 1971, providing for mutual reduction in four city-pair markets for one year.[6] Application for Board approval was made on June 23, 1971, and interested parties were given 15 days to file comments. In its comment petitioner raised substantially the same issues raised here on appeal. The CAB denied petitioner's request for a hearing and approved the agreement August 19, 1971, Order 71–8–91. It is the approval of this agreement which is before us today.

We turn first to petitioners contention that a hearing was required because of the anti-competitive aspects of the agreement. Petitioner argues that the agreement is so "at odds with established concepts of anti-trust law" and raises questions of such substantial importance as to require a hearing. Without a hearing, say petitioners, the Board lacked sufficient grounds for approval of the agreement.

 Of course, most Section 412 agreements will have anti-trust implications. Furthermore, "the [mere] fact that these questions are difficult and important . . . does not mean an evidentiary hearing is an essential prerequisite to their satisfactory resolution." National Air Carriers Ass'n v. C.A.B., 141 U.S.App.D.C. 31, 40, 436 F. 2d 185, 194 (hereinafter *NACA I*). As we have said before, there is no statutory requirement for a hearing as a precondition to Board approval under Section 412.[7] It is true that in certain cas-

5. *Id.*

6. By reducing the number of flights, an airline reduces the number of seats available. Unless demand is affected to the same extent, a reduction in available seats will normally result in a higher "load factor." "Load factor" refers to the percentage of available seats actually used.

The proposed reductions are as follows:

To May 31, 1972

| | Present Level Weekly Nonstop Round Trips 4 | Proposed Level | Percent of Reduction |
|---|---|---|---|
| NY–LA | 185 | 132 | 28.9 |
| NY–SF | 143 | 89 | 38.0 |
| CHI–SF | 147 | 105 | 28.6 |
| WASH–LA | 73 | 66 | 10.2 |

June 1 to September 16, 1972

| | Present Level Weekly Nonstop Round Trips 4 | Proposed Level | Percent of Reduction |
|---|---|---|---|
| NY–LA | 185 | 157 | 15.4 |
| NY–SF | 143 | 121 | 15.7 |
| CHI–SF | 147 | 126 | 14.3 |
| WASH–LA | 73 | 69 | 6.1 |

It was the objective of the agreement to raise the load factors in the three markets from a level of 26–36% to 50–60%.

7. National Carrier Ass'n v. C. A. B., 141 U.S.App. 31, 436 F.2d 185 (1970) (hereinafter *NACA I*) ; National Air Carrier Ass'n v. C. A. B., 143 U.S.App.D.C. 140, 442 F.2d 862 (1971) (hereinafter *NACA II*). As we said in *NACA II*, 143 U.S. App.D.C. at 141, 442 F.2d at 864.

es the anti-trust issues may not lend themselves to a satisfactory disposition without a hearing.[8] But we have made it quite clear that the Board should have a degree of latitude in determining whether a full evidentiary hearing will be necessary in a particular case. *NACA I* at 194, National Air Carriers Ass'n v. C.A.B., 143 U.S.App.D.C. 140, 141, 442 F.2d 862, 864 (hereinafter *NACA II*). In reviewing this determination, this court will not substitute its own view for that of the Board. Rather, the question for us is whether there exist substantial and material disputed issues of fact or whether by refusing to conduct a hearing the Board "denied [itself] the materials requisite for a rational decision." *NACA II*, 143 U.S. App.D.C. at 146, 442 F.2d at 868.

Here, petitioner was afforded an opportunity to present whatever facts it believed might be relevant. Petitioner did not offer any facts, nor did it suggest what facts it might offer at a hearing. Furthermore, the record does contain information as to prior unilateral capacity reductions and their effects, projections as to traffic growth, and impact upon competing carriers in other markets. While there was some disagreement as to the course of conduct which would be pursued by the three carriers,[9] there was not the kind of disagreement as to material and substantial factual questions which would require a full evidentiary hearing.

Moreover, this was a limited agreement, confined to only four city-pair markets and lasting a single year. We have heretofore upheld Board determination to proceed without an evidentiary hearing where the agreement was novel and of an "interim" or short term nature.[10] In cases of this kind it may well be that "a month of experience will be worth a year of hearings." American Airlines v. C.A.B., 123 U.S.App.D.C. 310, 319, 359 F.2d 624, 633 (1966), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L. Ed.2d 75. Here, the Board emphasized in approving the agreement that it would maintain jurisdiction in order to condition the agreement, shorten its term, or terminate it if circumstance should dictate.

In light of the seriousness of the problem facing the industry, the delay necessitated by a hearing, the limited nature of the agreement, and the adequate information at hand, we cannot say that a hearing was required by law.

*The Impact on Labor*

Petitioner also claims that the Board should have held a hearing on the impact of the agreement on carrier employees in order to determine whether to apply labor protective conditions. Petitioner contends that since the Board made no findings as to the impact on employees, the Board's approval of the agreement is without adequate support. The CAB appears to respond that since labor protective conditions are for policy reasons inapplicable to reduction agreements, no inquiry is necessary as to the impact of the agreement on labor in this case. The Board also argues that a hearing would have delayed implementation of the agreement and that any conditions imposed would amount to a financial burden on the carriers. This, says the Board, would run counter to the

---

8. *See NACA I*, 141 U.S.App.D.S. 31, 436 F.2d 185 (1970) ; Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 17–18, 420 F.2d 577, 585–586 (1969) ; Citizens for Allegan County, Inc. v. FPC, 134 U.S.App.D.C. 229, 232–233, 414 F.2d 1125, 1128–1129 (1969).

9. Some concern was expressed that capacity released from the four markets under the agreement might be diverted to other markets or charter service in competition with other air carriers. The applicant carriers represented that this would not occur and the Board approved the agreement upon this condition and with the authority "to impose conditions [to prevent diversion of capacity] at a later date" if it should prove necessary.

10. *See, e. g.*, National Air Carriers Ass'n v. C. A. B., 141 U.S.App.D.C. 31, 436 F.2d 185.

purpose of the agreement: reduction of carrier losses.

■■ But the CAB response misses the mark on both counts. In approving agreements under Section 412 the Board must find that the agreement is not adverse to the public interest. It has long been held that the welfare of displaced employees is a legitimate factor within the public interest.[11] As the Board itself stated in *United Western, Acquisition of Air Carrier Property:*

> On balance, [the agreement] must benefit the public as a whole; otherwise we would disapprove it. Very often, the benefits to the stockholders and to the public will be at the expense of some of the employees of the companies involved. We think it only equitable that in such circumstances the hardships borne by adversely affected employees should be mitigated by provisions for their benefit.[12]

Thus it may be that an agreement will be disapproved because its impact on carrier employees outweighs the positive aspects of the agreement; or that an agreement will be approved only because its impact on carrier employees is mitigated by labor protective provisions; or it may be that the impact on carrier employees is so small as to require neither disapproval of the agreement nor imposition of labor protective conditions. In

any case, while the decision to impose *conditions* is a policy question left largely to the discretion of the Board, we cannot believe that the Board would as a matter of policy simply ignore entirely the impact of the agreement upon carrier employees. Such a decision could amount to a refusal even to consider what may develop to be a legitimate factor in balancing all elements essential to a just determination of the public interest.[13]

But it is not clear from the Board's order whether the Board concluded that it may as a general policy refuse to consider the impact of reduction agreements on carrier employees, or whether the Board merely determined that the adverse impact on employees was overborne by the positive aspects of the agreement in this particular case.

■ On the one hand, the Board seems to have concluded that consideration of employee welfare was unnecessary since "the instant agreement does not create changes in any carrier's operational authority." But whether operational authority changes or not, the impact on employees may be the same,[14] and such a distinction does not erase the Board's duty to consider the welfare of carrier employees under the public interest standard when it approves agreements under Section 412. On the other

---

11. United States v. Lowden, 308 U.S. 225, 235–236, 60 S.Ct. 248, 84 L.Ed. 208; Seven States Area Investigation, 30 CAB 473, 475–577 (1960); North Atlantic Route Transfer Case, 14 CAB 910, 916–917 (1951).

12. 11 CAB 701, 708 (1950). Aff'd sub nom. Western Air Lines v. C. A. B., 194 F.2d 211, 213–215 (C.A. 9, 1952).

13. *Cf.* Air Line Pilots Association, International v. C. A. B., 148 U.S.App.D.C. 24, 458 F.2d 846, 852 (1972).

14. Operational authority refers to the authority given to carriers by the Board to operate between given points. The CAB states that it has been in cases where there is a change in operational authority that labor protective conditions have been applied. The Board argues that where it grants a change in operational authority

the Board assumes a different obligation to employees than in cases where "fluctuations, rises and falls, and changes in volume or character of employment [are] brought about *solely by other causes.*" Here, says respondent, "the Board has merely facilitated realization of a state of affairs which should have come to pass long before" as a "product of the basic economic law of supply and demand." But even mergers are only products of supply and demand. In each case the Board is granting an exception to a general rule which prohibits reacting to supply and demand in ways which may in the long run threaten competition. In any case, the Board's duty under the *public interest standard* derives from the requirement of Board approval of such agreements and not from the nature of the agreement.

hand, it appears possible that the Board assumed adverse impact on employees, but determined the impact overborne by competing interests.

We hesitate to uphold the Board where this aspect of its decision appears to be so unclear. S.E.C. v. Chanery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L. Ed. 626 (1943). "The function of the court is to assure that the agency has given reasoned consideration to all the material facts and issues. This calls for insistence that the agency articulate with reasonable clarity its reasons for decision. . . ." [15] Therefore, we remand to the Board so that it may clarify its reasons for approving the agreement over the claims of adverse impact on carrier employees.

We do not mean to say that without more the Board must necessarily hold a hearing to resolve this issue. We leave this to the discretion of the Board subject to the guidelines discussed above. But the Board must, at a minimum, address the question of adverse impact on carrier employees [16] and set forth clearly its reasons for concluding that the public interest lay in approval of the agreement.

While the agreement in question has now run its course, we note that the CAB recently approved a six month extension. Petitioner did not file comment with respect to this extension; but this may not be surprising in view of the Board's earlier decision which might have been taken to mean that the Board would never consider the impact of such agreements on carrier employees as a matter of policy. On this remand we think the Board should now invite comments from petitioner as to the impact the agreement has had, and will be expected to have, on carrier employees. Furthermore, the public interest issue should be reappraised if such comments are received.

Because the agreement has not evoked specific complaints from labor during its operation, and because of the disruption which would result from outright termination of the agreement, we leave it to the Board's discretion to permit the agreement to continue pending re-consideration by the Board. In view of the short term nature of the extension, we assume that the Board will proceed most quickly to a resolution.

---

15. Greater Boston Television Corp. v. F. C. C., 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851.

16. For instance, what impact upon petitioner can be expected from the statistics set forth in footnote 19, page 7, of the order under review?