**CITY OF HUNTINGBURG, INDIANA,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent,

Public Service Company of Indiana et al.,
Intervenors.

The **PUBLIC SERVICE OF INDIANA NEGOTIATING COMMITTEE OF the INDIANA MUNICIPAL ELECTRIC ASSOCIATION CORPORATION et al.,**
Petitioners,

v.

**FEDERAL POWER COMMISSION,**
Respondent,

Public Service Company of Indiana et al.,
Intervenors.

Nos. 72–1890, 72–1893.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 29, 1974.

Decided May 6, 1974.

---

Charles F. Wheatley, Jr., Washington, D. C., with whom Jerome C. Muys and Grace Powers Monaco, Washington, D. C., were on the brief, for petitioner in No. 72–1890.

George Spiegel, Washington, D. C., with whom Sandra J. Strebel and Robert C. McDiarmid, Washington, D. C., were on the brief, for petitioner in No. 72–1893.

Drexel D. Journey, Deputy Gen. Counsel, F. P. C., with whom Leo E. Forquer, Gen. Counsel, and George W. McHenry, Jr., Acting Solicitor, F. P. C., at the time the brief was filed, were on the brief, for respondent.

Charles W. Campbell, Plainfield, Ind., of the bar of the Supreme Court of Indiana, pro hac vice, by special leave of court with whom Howard E. Wahrenbrock and Christopher T. Boland, Washington, D. C., were on the brief for intervenors, Public Service Co. of Ind. and Southern Ind. Gas and Electric Co.

David S. Richey, Lebanon, Ind., and William C. Wise, Washington, D. C., were on the brief for intervenor, Indi-

ana Statewide Rural Electric Cooperative, Inc.

Before LEVENTHAL, MacKINNON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge.

Petitioners, the City of Huntingburg, Indiana, and the cities affiliated with the Public Service of Indiana Negotiating Committee (hereinafter collectively referred to as Cities), seek review of a Federal Power Commission order of 26 May 1972 [1] accepting the rate schedule filings of Public Service Company of Indiana (PSCI) and Southern Indiana Gas and Electric Co. (SIGECO). PSCI and SIGECO are public utilities [2] subject to FPC regulation under subchapter II of the Federal Power Act.[3] The rate schedule filings, as the Commission put it, "embody the terms and conditions of an Interconnection Agreement entered into on March 9, 1971, among the United States, acting through the Rural Electrification Administration, Indiana Statewide, Public Service and Southern Indiana." [4] Indiana Statewide Rural Electric Cooperative, Inc. (Statewide) is a cooperatively owned utility whose facilities were financed in large part by loans from the Rural Electrification Administration.[5]

Cities raise no objections to the basic provisions of the Interconnection Agreement, which obligate PSCI, SIGECO, and Statewide to interconnect their bulk power supply systems, to coordinate operation of their facilities in certain respects, and to consult mutually on advance systems planning. However, the Cities argue that certain provisions of the Agreement would produce substantial anticompetitive effects in the market served by PSCI and SIGECO. They seek an order instructing the FPC to excise the disputed provisions from the Interconnection Agreement or, in the alternative, an order remanding the case to the Commission for an evidentiary hearing on whether the challenged provisions, if retained, would advance the public interest.

On the basis of the record supplied to us on review and the opinion accompanying the Commission's order, we are unable to discern the reasons for the Commission's decision to accept the allegedly restrictive provisions of the Interconnection Agreement as part of the PSCI-SIGECO rate filing. We therefore remand to the Commission for hearings in accordance with Part III of this opinion.

## I. BACKGROUND

### A. *History of the Interconnection Agreement*

Most of the historical background of this controversy centers on the formation and development of Statewide and its predecessor, Hoosier Cooperative Energy, Inc. (Hoosier). Hoosier was organized by sixteen rural electric membership cooperatives in 1961.[6] On 15 June 1961 it received a loan commitment of $60 million from the Rural Electrification Administration (REA) for construction of a generation and transmis-

---

1. Public Service Co. of Indiana, Inc. and Southern Indiana Gas & Elec. Co., F.P.C. Docket No. E–7638; Public Service Co. of Indiana, Inc., F.P.C. Docket No. E–7647 [hereinafter Commission Order], Joint App. at 445.

2. As defined by section 201 of the Federal Power Act, 16 U.S.C. § 824(b), (c), (e) (1970).

3. 16 U.S.C. §§ 824–824h (1970).

4. Commission Order, *supra* note 1, Joint App. at 450–51.

5. Pursuant to the Rural Electrification Act, 7 U.S.C. § 901 et seq. (1970). The Com-

mission has determined that Statewide "is not properly classifiable as a 'public utility' and therefore not subject to the general Part II regulatory jurisdiction of this Commission . . . . Dairyland Power Cooperative, et al., 37 F.P.C. 12 (1967) [Further citations omitted]." Commission Order, *supra* note 1, Joint App. at 450. We need not pass on this assertion in disposing of this case as we do.

6. Hoosier and its member cooperatives were organized pursuant to the Rural Electric Membership Corporation Act, Ind.Stat.Ann. § 55–4401 et seq. (Burns [Code Ed.] 1973).

sion system.[7] When Hoosier could not readily obtain a certificate of convenience and necessity from the Indiana Public Service Commission (Indiana PSC), it transferred its loan commitment to Statewide, which had been incorporated in 1935 with PSC approval. Statewide then entered into long-term contracts with the Hoosier member distribution cooperatives. However, SIGECO and PSCI successfully challenged Statewide's authority to operate the Hoosier system in Southern Indiana Gas & Electric Co. v. Indiana Statewide Rural Elec. Coop.[8] The Indiana Supreme Court directed the circuit court to enjoin Statewide from generating or transmitting electricity "until it obtains a current 'certificate of convenience and necessity' from the Public Service Commission of Indiana."[9]

Subsequently the REA took title to Statewide's facilities under the authority of section 7 of the Rural Electrification Act.[10] Title was to revert to Statewide within four and one half years if it could obtain authority to operate the system from the Indiana PSC.[11] In 1969 Statewide filed with the PSC a petition for certification in which it sought only the authority to serve its own members. PSCI and SIGECO intervened in opposition to Statewide's petition. In a letter dated 16 February 1970 the Indiana PSC set forth a proposed settlement among the parties.[12] The proposal contained essentially the same terms as the Interconnection Agreement ultimately signed by the parties, including a clause providing:

> Hoosier Energy's certificate shall be so conditioned that it can sell and

resell within the terms of the wheeling agreement only to its 17 REMC [Rural Electric Membership Cooperative] members, with its 17 members being named in the certificate.[13]

The Interconnection Agreement was signed by Statewide, the REA, PSCI, and SIGECO on 9 March 1971 for a 25-year term beginning on that date. On 25 June 1971 the Indiana PSC granted Statewide a certificate of convenience and necessity allowing Statewide to "engage in the production, transmission, delivery, distribution, supplying, furnishing or sale of electric energy to the Member REMCs and to PSCI and SIGECO . . . ."[14]

B. *The Challenged Contractual Provisions*

The main focus of the controversy is on section 5.05 of the Interconnection Agreement, which provides:

> . . . Statewide will serve only NSA [National Southwire Aluminum Co.] during the remaining term of said contract and Hoosier Members while the systems of the parties are interconnected, and power and energy furnished and delivered by Public Service and SIGECO under this Agreement shall be resold or delivered by Statewide to NSA during the term of said contract and to Hoosier Members only; *provided, however,* that Statewide may continue to perform its obligations under (i) its power supply agreement with Southeastern Power Administration, and (ii) all power and purchase pooling agreements it now has with other entities until the agreements referred to in (i) and

---

7. Authority for this loan was provided by section 4 of the Rural Electrification Act, 7 U.S.C. § 904 (1970).

8. 251 Ind. 459, 242 N.E.2d 361 (1968).

9. 251 Ind. at 466, 242 N.E.2d at 368.

10. 7 U.S.C. § 907 (1970).

11. The REA designated Statewide as its agent for operation of the system. PSCI and SIGECO obtained a preliminary injunction against REA's generation, transmission, and sale of electricity in competition with the two utilities, but the injunction was dissolved in Public Serv. Co. of Indiana v. Hamil, 416 F.2d 648 (7th Cir. 1969), cert. denied, 396 U.S. 1010, 90 S.Ct. 571, 24 L. Ed.2d 503 (1970).

12. H.R.Rep.No.91–1767, 91st Cong., 2d Sess. 30 (1970).

13. *Id.* at 32.

14. Joint App. at 343.

(ii), can be legally or mutually terminated by Statewide and the other parties thereto.[15]

Cities assert that this provision represents a horizontal division of markets, a *per se* violation of section 1 of the Sherman Antitrust Act [16] under United States v. Topco Associates, Inc.[17] They further argue that section 1.03 of the Agreement, which requires that Statewide contractually prohibit its members from reselling electric power sold to them at wholesale by Statewide, constitutes an unlawful restraint on alienation under United States v. Arnold, Schwinn & Co.[18] The potential for anticompetitive impact is also raised with respect to sections 1.01 (limiting the scope of Statewide's application for a state certificate of convenience and necessity), 1.03.1 (requiring Statewide to assign its contract with the City of Jasper, Indiana, to SIGECO), 3.02.1 (prohibiting Statewide from constructing a contemplated 161 kilovolt interconnection with East Kentucky Rural Electric Cooperative), 3.03 (assigning to PSCI and SIGECO all unused capacity in Statewide's tie line with the Big Rivers Rural Electric Cooperative Corporation), and Schedule H (giving PSCI and SIGECO exclusive right to all unused capacity in the Statewide transmission system).

The Cities describe the harm that these provisions would allegedly occasion as follows:

> The net effect of the restrictive provisions in the Interconnection Agreement is to prevent Hoosier [Statewide] from acting as a viable competitive force in the wholesale power supply market in Indiana and Kentucky, thereby preventing not only Hoosier itself from competing with PSI [PSCI] and SIGECO in the supply of power in bulk to the Cities, but

effectively preventing Cities from entering the bulk power supply market as their own bulk power suppliers with generating sources other than PSI or SIGECO. Thus, Cities are for at least the next quarter century "assigned" to PSI as captive wholesale customers.[19]

### C. The Commission's Action

PSCI and SIGECO submitted the Interconnection Agreement to the FPC on 14 June 1971 as an interstate rate schedule filing. On 26 May 1972 the Commission accepted the tendered filing with the following observation:

> In granting the relief herein afforded, we have examined the controlling legal requirements, considered relevant and material factual data and applied the policy considerations which are committed to the discretion of the Commission under the Federal Power Act. We are persuaded that the public interest will be served by authorizing the filing of the rate schedules and the transfer of the utility facilities. . . . We find it unnecessary and inappropriate to order formal hearings as requested by Cities in light of our investigation and analysis, as reflected herein. Accordingly, we deny their requests in that regard.[20]

Chairman Nassikas and Commissioner Moody dissented with the statement, "[T]he Commission is required to consider the anticompetitive allegations raised by Cities . . . [and] to provide a hearing for the adjudication of the factual predicates for such allegations."[21] On 26 July 1972 Cities' application for rehearing was denied by operation of law since the Commission was evenly divided [2–2] on the ques-

15. *Id.* at 101.

16. 15 U.S.C. § 1 (1970).

17. 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

18. 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

19. Brief for Petitioner Public Service of Indiana Negotiating Committee at 36.

20. Commission Order, *supra* note 1, Joint App. at 447.

21. *Id.* at 472.

tion of whether they should be granted."[22]

## II. BASIS FOR THE REMAND

### A. *The Commission's Duty to Evaluate the Potential Anticompetitive Effects of the Interconnection Agreement*

■ The Commission is charged with the general responsibility of carrying out its regulatory tasks in a manner that will advance the public interest.[23] Courts have long recognized that careful assessment of the potential effects of a proposed action on competition in the regulated industry is an integral aspect of any application of the public interest standard. As we stated in Northern Natural Gas Co. v. FPC:[24]

> Although the Commission is not bound by the dictates of the antitrust laws, it is clear that antitrust concepts are intimately involved in a determination of what action is in the public interest, and therefore the Commission is obliged to weigh antitrust policy.[25]

Most recently, in Gulf States Utilities Co. v. FPC,[26] the Supreme Court held that the Commission must consider the potential anticompetitive consequences of a public utility's proposed securities issue before authorizing the issue pursuant to section 204 of the Federal Power Act.[27] The Court made the following remarks concerning the relationship of the Commission's regulatory authority under the Act and the general policies embodied in the antitrust laws:

> Title II certainly did not preclude the operation of the antitrust laws, and it

vested the Federal Power Commission with important and broad regulatory power in the areas described above. [Citations omitted.] This power clearly carries with it the responsibility to consider, in appropriate circumstances, the anticompetitive effects of regulated aspects of interstate utility operations pursuant to §§ 202 and 203, and under like directives contained in §§ 205, 206, and 207. The Act did not render antitrust policy irrelevant to the Commission's regulation of the electric power industry. Indeed, within the confines of a basic natural monopoly structure, limited competition of the sort protected by the antitrust laws seems to have been anticipated.[28]

■ In the case at bar, the Interconnection Agreement was "properly filed as an interstate rate schedule"[29] of PSCI and SIGECO and was therefore subject to the regulatory authority vested in the Commission by sections 205 and 206 of the Federal Power Act.[30] *Gulf States* made it clear that this regulatory authority "carries with it the responsibility to consider . . . the anticompetitive effects" of any proposed action by a public utility. Therefore, when the Commission faced the decision of whether to approve the Interconnection Agreement as filed, it was obligated to consider the alleged anticompetitive effects of the provisions to which the Cities objected. As the Commission itself recognized, "Anticompetitive arguments fall within the scope of the public interest concept. Public interest considerations are the touchstone of the Fed-

22. Public Service Co. of Indiana, Inc., et al., F.P.C. Docket Nos. E–7638, –7647, Separate Statements on Rehearing (27 July 1972), Joint App. at 522.

23. *See* Citizens for Allegan County, Inc. v. FPC, 134 U.S.App.D.C. 229, 237, 414 F.2d 1125, 1133 (1969) : "[T]he FPC has an active and independent duty to guard the public interest . . . ."

24. 130 U.S.App.D.C. 220, 399 F.2d 953 (1968).

25. 130 U.S.App.D.C. at 225, 399 F.2d at 958. *See also* City of Lafayette v. SEC, 147 U.S.App.D.C. 98, 105, 454 F.2d 941, 948

(1971), aff'd sub. nom. Gulf States Utilities Co. v. FPC, 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973) ; Latin America/Pac. Coast S.S. Conf. v. FMC, 150 U.S.App.D. C. 362, 465 F.2d 542, cert. denied, 409 U.S. 967, 93 S.Ct. 269, 34 L.Ed.2d 234 (1972).

26. 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973).

27. 16 U.S.C. § 824c (1970).

28. 411 U.S. at 758–759.

29. Commission Order, *supra* note 1, Joint App. at 462.

30. 16 U.S.C. §§ 824d and 824e (1970).

eral Power Act." [31] The court fully agrees, so our task is now to assess the manner in which the Commission attempted to discharge its responsibility.

## B. *Inadequacy of Record and Commission's Order*

■ The Commission's approval of the PSCI–SIGECO-Statewide Interconnection Agreement could have been based on any one of three grounds: (1) the Agreement contains no negative restrictions on the operations of the parties and thus cannot create anticompetitive effects; (2) the provisions labelled as negative restrictions by the Cities do not *per se* limit the scope of Statewide's facilities and marketing, but merely recognize limitations already lawfully imposed by the REA and the Indiana PSC; or (3) the Agreement does contain restrictive provisions, as the Cities allege, but the restrictions are not inconsistent with federal antitrust policy, or at least not to an extent sufficient to outweigh other factors in the Commission's overall public interest calculation.

Since the court is unable to glean from the record or the Commission's opinion which of these grounds the Commission regarded as controlling, we can-

not properly review the order accepting the Interconnection Agreement as a rate filing. Therefore, a remand is necessary for clarification of the Commission's position.

At first blush, the Commission's opinion appears to rest on the third ground described above. The following passages from the opinion lend support to this interpretation:

> We have reviewed Cities' alleged anti-competitive arguments. We do so pursuant to the exercise of our regulatory authority under the Federal Power Act. [Citations omitted] We find nothing therein which would warrant formal evidentiary hearings at this time as requested by Cities. The March 9 Agreement is a reasonable arrangement and its effectuation will serve the purposes of the Federal Power Act. Cities do not purport to show the March 9 Agreement, executed by the United States, to be, *per se,* in violation of the antitrust laws and our analysis shows no basis therefor. [32]

. . . . . .

In our disposition of this matter and Cities' contentions, we have taken a "hard look" at all matters, including

---

31. Commission Order, *supra* note 1, Joint App. at 467. The Commission also made the following statements:

> Under the provisions of the Federal Power Act, *inter alia* Sections 205 and 206, 16 U.S.C. 824d and 824e, this Commission may enter upon a hearing and change provisions of such rate schedules as it determines to be unlawful. In the exercise of that jurisdiction, the Commission is guided by the standards of the Federal Power Act: just, reasonable, without undue discrimination or preference or otherwise unlawful.
>
> \*     \*     \*     \*
>
> We have reviewed Cities' alleged anticompetitive arguments. We do so pursuant to the exercise of our regulatory authority under the Federal Power Act.

*Id.* at 462, 464. The Commission's assertion that it had jurisdiction to scrutinize the Interconnection Agreement under the regulatory authority conferred by sections 205 and 206 should be afforded great weight. *See* Pan Am. World Airways, Inc. v. CAB, 129 U.S.App.D.C. 159, 172, 392 F.2d 483, 496

(1968); American Airlines, Inc. v. CAB, 125 U.S.App.D.C. 6, 10 n. 4, 365 F.2d 939, 943 n. 4 (1966). PSCI and SIGECO argue that the main provision of the Federal Power Act relating to interconnection arrangements is section 202(a), 16 U.S.C. § 824a(a) (1970), which merely expresses the policy of *promoting* interconnection and does not empower the Commission to *regulate* the terms of specific interconnection agreements under the public interest standard. Supplemental Brief for Intervenors at 2–11. We do not disagree. However, we note that the Interconnection Agreement involved here was offered to the Commission as part of a rate schedule filing and was thus subject to a public interest determination under *sections 205 and 206.* The Commission can evaluate whether specific provisions of a given interconnection agreement are consistent with the public interest without negating the general policy of promoting electric systems interconnections expressed in section 202(a).

32. Commission Order, *supra* note 1, Joint App. at 464.

those which the Cities find objectionable. . . . Anti-competitive arguments fall within the scope of the public interest concept. Public interest considerations are the touchstone of the Federal Power Act. Through application of the requirements of the Federal Power Act to power pooling and coordination arrangements, the interests of the antitrust laws are served. Those laws contemplate application of the rule of reason standard. The Federal Power Act standards are not dissimilar—just, reasonable, without undue discrimination or preference, otherwise unlawful, and in accordance with the objectives of Section 202(a) thereof. The March 9 Agreement is a reasonable arrangement. Its effectuation will serve the purposes of the Federal Power Act.[33]

The dissenting Commissioners apparently assumed that the Commission majority had found restrictive provisions in the Agreement but had justified them on the basis of an antitrust "rule of reason" or general public interest principles. The dissenters stated:

> Without a hearing, we cannot fairly assess the merits, if any, of Cities' allegations in the pleadings before us. For example, it may well be that the competitive impact of territorial restrictions in the interconnection agreement are outweighed by the public interest and the need to avoid duplication of facilities. On the other hand, the Supreme Court has stated that horizontal territorial agreements are *per se* violative of the Sherman Act. We should require a hearing and afford the Cities the opportunity to present evidence in support of their allegations. Here, there are substantial anticompetitive issues requiring resolution based on a hearing record.[34]

Thus, a common ground between the majority and minority in the Commission seems to have been that the Agreement limits the potential for competition with PSCI and SIGECO in the electricity distribution market. The apparent focus of the dispute between the two factions was the Cities' allegations that these limitations violate antitrust policy and disserve the public interest.

However, at oral argument, counsel for the FPC interpreted the Commission's opinion as holding that the Interconnection Agreement imposes no negative restrictions on Statewide's ability to compete with PSCI and SIGECO. As counsel explained his construction in a colloquy with the court reproduced in the margin,[35] the Commission concluded that the Agreement does not preclude

---

33. *Id.* at 467–468.

34. *Id.* at 473.

35. COUNSEL FOR FPC: . . . [T]hese are restrictions which provide operating reasons to keep a system in parallel phase and synchronism. And when you get to 903 and you look at the planning coordination for the future, so far as I know . . . *there is nothing in this document that says that Indiana can't—Indiana Statewide can't plan for whatever it can legally serve.*
THE COURT: . . . [Y]ou're saying there are no negative restrictions?
FPC COUNSEL: I do, yes, sir. I do not read this as having negative restrictions, and *I'm suggesting to you you're being asked to decide a hypothetical case.*
THE COURT: Well, this puts a very different complexion on the controversy, I must say.
    \*    \*    \*    \*    \*

THE COURT: . . . [I]f that was the answer to the dissenters, I don't know why the Commission could not have just said so, if that was their theory. The dissenters said, "We're worried about these negative restrictions, and maybe they require a hearing." Why couldn't the Commission have said, "We don't see any negative restrictions. All we see is a statement of present capabilities and present service area . . . . And everybody says, 'This is our obligation, and this is how we are going to cooperate with each other . . . and, we are free to do whatever comes naturally in the future except that we agree to coordinate with each other. We agree under the *contract*, that is, to do whatever we want·to. We may have to get state approval, that sort of thing, but we're free as far as the contract is concerned. . . . We are free to do whatever we want to as a utility. All we have to do is coordinate with each other

Statewide from expanding its facilities, seeking new customers and new interconnections, or otherwise exploiting the market served by PSCI and SIGECO. Under counsel's reading of the Commission's opinion the only constraints on such activities by Statewide are that Statewide consult with PSCI and SIGECO in its planning, as prescribed by section 9.03 of the Agreement,[36] and that it obtain necessary authorization for its plans from the Indiana PSC and the REA. While the court will not permit counsel to supply a rationale for an agency's order when the agency itself has clearly articulated reasons for its action,[37] the Commission's opinion in this case is not so lucid and unambiguous [38] that we can reject out-of-hand counsel's construction of it.

■ Finally, a variant of the rationale offered by the FPC's counsel is another possible basis for the Commission's order. The Commission might have reasoned that although the Interconnection Agreement contains provisions that appear to subject Statewide to negative restrictions on its operations, those provisions do no more than recite limitations already imposed on Statewide by the Indiana PSC and the REA. We would note that if this was the rationale of the Commission's order,[39] it should be re-examined on remand. While the terms of

---

on interchange of power and on our planning to conserve power.' "
FPC COUNSEL: The Commission reviewed it in the technical jargon that it uses in power pooling operation . . . .

     *      *      *      *      *

THE COURT: . . . [C]an you tell me that the Commission said that there are no negative restrictions in these contracts, and the Commission found that was the basis for not setting a hearing on the anticompetitive-related aspects?
FPC COUNSEL: That is how I read the majority order.
THE COURT: Are you aware that you caused great surprise to the court, who had read the majority decision and didn't think that was the gravamen of their rationale?
FPC COUNSEL: I saw some surprise registered, yes, sir.
THE COURT: Do you realize the two dissenting commissioners also would be surprised because they addressed their dissents to the same question I'm raising and not to the one that you say is in the majority opinion?
FPC COUNSEL: I so understand. I'm giving you my reading of the majority opinion . . . .

36. Joint App. at 108.

37. City of Lafayette v. SEC, 147 U.S.App. D.C. 98, 109, 454 F.2d 941, 952 (1971), aff'd sub nom. Gulf States Utilities Co. v. FPC, 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973); National Air Carrier Ass'n v. CAB, 141 U.S.App.D.C. 31, 41, 436 F.2d 185, 195 (1970); Public Serv. Comm'n v. FPC, 141 U.S.App.D.C. 174, 176 n. 2, 436 F.2d 904, 906 n. 2 (1970).

38. For example, the Commission stated enigmatically:

[W]e deem it important to note that the action herein taken does not foreclose legitimate options or interests of Cities, or others, in coordinating their electric utility operations with Indiana Statewide, Public Service, Southern Indiana or others. They are encouraged to do so.

Commission Order, *supra* note 1, Joint App. at 465. If the Interconnection Agreement does in fact prevent Statewide from supplying power to anyone except its member co-operatives, PSCI, and SIGECO, it is not clear how the Commission's approval of the Agreement "does not foreclose . . . Cities . . . [from] coordinating their electric utility operations with Indiana Statewide . . . ." In addition, the Commission concluded that "Cities' contentions are shown ' * * * too insubstantial or barren to indicate the existence of substantial anticompetitive issues . . . .' " *Id.* at 466. We might fairly construe this statement as a Commission finding that the Interconnection Agreement imposes no restraints on the competitive potential of any of the parties thereto.

39. There is language in the order suggesting that the Commission may have relied on this rationale:

The scope of Indiana Statewide's undertaking, as a bulk power supplier, is fundamentally a matter for decision and determination by it within the constraints of Rural Electrification Administration requirements. That agency, not this Commission, is the one charged by the Congress with overall Federal supervision and responsibility over activities and operations of entities such as Indiana Statewide. [Citations omitted.] The March 9, 1971, Agreement was negotiated and executed under the aegis of the Administra-

Statewide's certificate of convenience and necessity,[40] the Indiana Rural Electric Membership Corporation Act,[41] and the federal Rural Electrification Act[42] now limit Statewide's range of customers to its membership cooperatives, these limitations are not immutably fixed. The controlling legislation could be revised or repealed, thus enabling Statewide to apply for expanded authority from the Indiana PSC. However, if the contested provisions of the Interconnection Agreement[43] do in fact restrict Statewide's capacity as an electricity supplier for the full term of the Agreement, Statewide will be *contractually disabled* from seeking expansion of its operational authority for 25 years.[44] This distinction between contractual disabilities of fixed duration and statutory or regulatory restrictions of indefinite applicability demonstrates that the Commission should study the potential anticompetitive effects of the challenged provisions in the Agreement without regard to current legal limitations on Statewide's authority.[45]

---

tor. His judgments are reflected therein concerning Indiana Statewide's undertaking to serve various resale customers . . . and the types of contractual relationships between Indiana Statewide and its distribution type cooperative resale customers . . . . The Administrator's conclusions are not within the decisional authority of this Commission.

Similarly . . . the type of certificate of public convenience and necessity and other regulatory authority which Indiana Statewide may seek from the Indiana State Public Service Commission, is not within the regulatory jurisdiction of this Commission. They are questions to be considered and resolved by that Commission in the light of decisions of the Administrator and Indiana Statewide.

Commission Order, *supra* note 1, Joint App. at 460–61.

40. *See* text accompanying note 14 *supra*.

41. Ind.Stat.Ann. § 55–4401 et seq. (Burns [Code Ed.] 1973). Statewide is, as the Commission found, "a General District Corporation organized and existing pursuant to the laws of Indiana, the Rural Electric Membership Corporation Act, as amended, Burns Indiana Statutes Anno. 55–4401 et seq." Commission Order, *supra* note 1, Joint App. at 456. Section 21 of the Act provides: "A general district corporation is a corporation formed under this act for the purpose of furnishing services to local district corporations." Ind.Stat.Ann. § 55–4421 (Burns [Code Ed.] 1973). In section 11, a corporation formed under the Act is empowered to "make any and all contracts necessary and/or convenient for the full exercise of the powers in this act granted, including, without limiting the generality of the foregoing, contracts with any person, federal agency, or municipality *for the purchase* of energy needed by the corporation *to supply its members* . . . ." Ind.Stat.Ann. § 55–4411 (Burns [Code Ed.] 1973) (emphasis

supplied). On their face, these provisions seem to indicate that Statewide can furnish energy only to its members, and is legally disabled from transmitting electricity to any of the Cities allegedly harmed by the Interconnection Agreement. Given our disposition here, however, we need not express a view on the impact of these provisions.

42. 7 U.S.C. § 901 et seq. (1970). Under section 4 of the Act, 7 U.S.C. § 904 (1970), a borrowing cooperative like Statewide is limited to "furnishing of electric energy to persons in rural areas who are not receiving central station service."

43. *See* notes 15–19 *supra* and accompanying text.

44. Section 11.02 of the Agreement provides: "This Agreement shall remain in effect for an initial term of twenty-five (25) years from the date above written and thereafter until written notice of termination given by [PSCI], SIGECO or Statewide to each of the others at least five (5) years before the date of termination set forth in such notice."

45. This court confronted a similar problem in Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 420 F.2d 577 (1969). The FMC had approved without a hearing a contract for construction of a passenger terminal in the port of New York City and an accompanying agreement between carriers and the Port Authority for use of the terminal facilities. We remanded to the FMC for hearings on certain clauses of the agreements that (1) prohibited the City or the Port Authority from subsequently constructing or authorizing construction of any other passenger terminal facilities and (2) bound carriers who contracted with the Port Authority to exclusive use of the new facilities. The clauses were binding for the 20-year term of the lease under which the Port Authority agreed to rent the facilities from the City, plus 50 years thereafter. The court expressed concern about the duration of the

In SEC v. Chenery Corp. the Supreme Court stated:

> [T]he courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review. . . . [T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained.[46]

Since we are unable to determine on what ground the Commission accepted for filing the allegedly anticompetitive provisions of the Interconnection Agreement, we must remand for clarification of the Commission's reasoning.

## III. SCOPE OF THE REMAND

■ On remand, the Commission should endeavor to answer several questions. The fundamental inquiry is whether the provisions of the Interconnection Agreement challenged by the Cities represent negative restrictions[47] on Statewide's potential as a competitor with PSCI and SIGECO. If the Commission finds that there are no negative restrictions in the Agreement, as its counsel suggested at oral argument, the inquiry will be at an end. If it finds the contrary, however, the Commission must determine the scope and duration of the restrictions. As we indicated in Part II of this opinion, it is material whether the restrictions, if any, will bind the parties for the full 25-year term of the Agreement. If the Commission finds that the Agreement does contain negative restrictions that are binding on the parties for a definite term, it should examine in detail whether, on balance, those restrictions would advance the public interest. A component of the public interest standard is, of course, the policy expressed in the federal anti-trust statutes.[48] If the Commission concludes that the restrictive provisions both vindicate some public interest and violate anti-trust policy, it should "ascertain whether there exist 'alternative courses, other than those suggested by the applicant[s].'"[49] Finally, if the challenged provisions are found on balance to be contrary to the public interest, the Commission must determine whether they are severable from the remainder of the Agreement. This recitation of issues is not intended to be all-in-

restrictions, which we described as amounting to "a significant and perhaps total barrier to entry for the next seventy years." 137 U.S.App.D.C. at 16, 420 F.2d at 584. Although the FMC had retained jurisdiction to consider any application filed 20 years later to construct or operate new terminals, the court observed:

> [I]f the interim exclusion is a restraint going beyond the necessities of the case, the retention of jurisdiction could not undo the consequences of twenty years of complete market foreclosure and the vested interests and relationships that will inevitably develop.

137 U.S.App.D.C. at 21, 420 F.2d at 589. Because of the duration and scope of the challenged contractual provisions, we remanded to the FMC for hearings on whether the provisions were necessary and in the public interest.

46. 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L. Ed. 626 (1943). *See also* Air Line Pilots Ass'n v. CAB, 154 U.S.App.D.C. 316, 321–322, 475 F.2d 900, 905–906 (1973); Greater Boston Television Corp. v. FCC, 143 U.S. App.D.C. 383, 393, 444 F.2d 841, 851

(1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

47. We employ the term "negative restrictions" to denote those restrictions that are not simply necessary incidents of the parties' positive undertakings to interconnect, consult on planning, and the like.

48. *See* notes 24–31 *supra* and accompanying text. We emphasize that it may be the province of the Indiana PSC and the REA to determine the scope of operations by Statewide that will best serve the public interest *at present*. The issue is whether Statewide should be *contractually* disabled from expanding its operations in the event the Indiana Commission and the REA alter their concepts of the public interests in such a way that they are willing to expand Statewide's operational authority. *See* notes 39–45 *supra* and accompanying text.

49. Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 17, 420 F.2d 577, 585 (1969), *quoting* Citizens for Allegan County, Inc. v. FPC, 134 U.S.App.D.C. 229, 237, 414 F.2d 1125, 1133 (1969).

clusive, for the Commission should pursue any avenues that may lead to clarification of its reasoning process.

■ As in other cases in which we have instructed an agency to explore further potential anticompetitive problems,[50] we leave it to the judgment of the Commission to determine the nature and scope of the procedures to be employed on remand. However, the issues that the Commission must investigate are sufficiently complex and difficult that some form of hearing appears necessary. In selecting the form of its hearing, the Commission should heed the following language from Marine Space Enclosures, Inc. v. FMC:

> The requirement of a hearing in a proceeding before an administrative agency may be satisfied by something less time-consuming than courtroom drama. In some cases briefs and oral argument may suffice for disposition. Ordinarily, however, antitrust issues do not lend themselves to disposition solely on briefs and argument. Even though there may be no disputed "adjudicatory" facts, the application of the law to the underlying facts involves the kind of judgment that benefits from ventilation at a formal hearing. In some cases, however, the public hearing may usefully approach the legislative rather than the adjudicatory model.

. . . . . .

[W]e refrain at this juncture from specifying that our remand order requires an evidentiary hearing. . . . It may be that the issues can be adequately developed for Commission determination through receipt of documents and sworn statements, and hearing oral argument. Any evidentiary hearing may be limited to certain specific issues.[51]

Finally, the Commission should re-examine whether its consideration of the issues would benefit from permitting the cities affiliated in the Public Service of Indiana Negotiating Committee to intervene in the proceedings.

Remanded.

---

50. City of Lafayette v. SEC, 147 U.S.App. D.C. 98, 454 F.2d 941 (1971) ; Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 420 F.2d 577 (1969). See generally Air Line Pilots Ass'n v. CAB, 154 U.S.App.D.

C. 316, 475 F.2d 900 (1973) ; Citizens for Allegan County, Inc. v. FPC, 134 U.S.App. D.C. 229, 414 F.2d 1125 (1969).

51. 137 U.S. App. D.C. at 21–22, 420 F.2d at 589–590.