502 F.2d 453
 87 L.R.R.M. (BNA) 2140, 163 U.S.App.D.C. 451,
75 Lab.Cas. P 10,315
 AIR LINE PILOTS ASSOCIATION INTERNATIONAL, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent, American Airlines, Inc., et al.
AIR LINE DISPATCHERS' ASSOCIATION et al., Petitioners,
v.
CIVIL AERONAUTICS BOARD, Respondent, American Airlines, Inc., et al.
 Nos. 73-1214, 73-1229.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Feb. 27, 1974.
Decided Aug. 8, 1974.
 
 Robert S. Savelson, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Donald J. Capuano, Washington, D.C., was on the brief, for petitioner in No. 73-1214. Patrick C. O'Donoghue and Martin F. O'Donoghue, Jr., Washington, D.C., also entered appearances for petitioner in No. 73-1214.
 William G. Mahoney, Washington, D.C., for petitioners in No. 73-1229.
 Martin C. Seham, New York City, of the bar of the Supreme Court of the United States, pro hac vice, by special leave of court for intervenor, Allied Pilots Association and Aircraft Mechanics Benevolent Association. Richard Hibey and James P. Davenport, Washington, D.C., entered appearances for intervenors Allied Pilots Assn. and Aircraft Mechanics Benevolent Assn.
 Glen M. Bendixsen, Atty., C.A.B., for respondent. Richard Littell, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, Robert L. Toomey, Acting Associate Gen. Counsel, Litigation and Research, C.A.B., and Robert B. Nicholson, Atty., Dept. of Justice, were on the brief for respondent. R. Tenny Johnson, Gen. Counsel, and Warren L. Sharfman, Associate Gen. Counsel, C.A.B., at the time the record was filed, also entered appearances for respondent. Howard E. Shapiro, Atty., Dept. of Justice, also entered an appearance for respondent.
 Charles A. Miller, Washington, D.C., with whom Robert N. Sayler and Eugene D. Gulland, Washington, D.C., were on the brief, for intervenors trunkline carriers.
 Raymond J. Rasenberger and James L. Devall, Washington, D.C., were on the brief for intervenors, Frontier Airlines, Inc., et al.
 Before BAZELON, Chief judge, MacKINNON, Circuit Judge, and CHRISTENSEN,* United States Senior District Judge for the District of Utah.
 BAZELON, Chief Judge:
 
 
 1
 Petitioners, who are various groups of airline employees, challenge the CAB's approval of the airlines' Mutual Aid Pact, as amended. They contend that the Pact, as approved violates the national labor policy, the Railway Labor Act (RLA) and the antitrust laws; and that there is no substantial evidence to support the CAB's finding that the Pact is not adverse to the public interest.
 
 I.
 
 2
 Created in 1958 by six airlines, the Mutual Aid Pact represented a joint effort to soften the impact of strikes against individual companies. At its inception, the Pact provided only for 'windfall payments.' A strikebound company received payments from other Pact members equal to their increase in revenues resulting from the strike minus their added operating expenses in servicing the new business. The Pact was soon amended to provide for 'supplemental payments.' This feature enabled a carrier member to receive 25% Of its normal air transport operating expenses for operations shut down by the strike. A 1969 amendment to the Pact raised that figure to 50% During the first fourteen days of the strike, dropping by stages to 35% After a strike period of four weeks or longer. The additional payments over windfall to meet this allotment were to be contributed by each member in the proportion which its air transport operating revenues bore to the total revenue for all members. Individual carrier liability for supplemental payments was limited at first to onehalf of one percent of the carrier's intake for the prior year. That limitation was upped in 1969 to one percent by agreement of the Pact members.
 
 
 3
 Both the increase in supplemental payments rates and the higher ceiling on individual carrier liability were approved in the Board's 1973 order,[1] which followed an initial decision by the Administrative Law Judge refusing to allow the escalations.[2] These elements of the amended Pact are the primary focus of the unions' attack on the Board's action. Petitioners also contest the CAB's consent to a 1971 amendment to the Pact authorizing the participation of local service carriers.
 
 II.
 
 4
 The Supreme Court has recognized the responsibility of transportation agencies like the CAB to make decisions consistent with national labor policy. Burlington Truck Lines v. United States, 371 U.S. 156, 173, 83 S.Ct. 239, 9 L.Ed.2d 207. This responsibility was explicitly recognized in the Board's opinion and is not a matter of dispute on appeal. What is in dispute is the substance of national labor policy relevant to this case.
 
 
 5
 The national labor policy rests on the principle that parties should be free to marshall the economic resources at their disposal in the resolution of a labor dispute, consistent with the specific rights and prohibitions established by the labor statutes. It is not generally given to government agencies to 'regulate what economic weapons a party might summon to its aid.'[3] And this principle, of course, underlies the RLA, which is made applicable to air carriers by 45 U.S.C. 181 and by section 401(k)(4) of the Federal Aviation Act, 49 U.S.C. 1371(k)(4). That Act does establish certain procedures that must be followed in the direct bargaining process,[4] but once these procedures are exhausted without a settlement, either side is free to resort to economic self-help in an attempt to force a settlement most favorable to it.[5]
 
 
 6
 This is not to suggest that warfare between unions and the airlines may rage uninhibited under the RLA. Like other substantive labor legislation, the RLA imposes a duty on both employers and employees to bargain in good faith,[6] and it recognizes the right of employees to organize without employer interference.[7] But in this case the CAB specifically noted that 'the record is replete with evidence of the earnest and consistent good faith efforts of (the Mutual Aid Pact Members) to find a resolution to their strikes throughout the course of difficult labor negotiations.'[8] The Board also points to evidence refuting any notion that the Pact functions as an employer device to control the formation of bargaining units.[9]
 
 
 7
 The permissibility of the Mutual Aid Pact under the RLA is supported by Kennedy v. Long Island R.R., 319 F.2d 366 (2d Cir.), cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 61 (1963). The case involved a union attack on a strike insurance plan in the railroad industry, a device whose similarity to the Mutual Aid Pact in the airlines industry was specifically noted in the Second Circuit's opinion. In upholding the plan, the court began with the principle set out above and found further support for its result in section 20 of the Clayton Act[10] and section 4 of the Norris-La Guardia Act,[11] which sanction the payment of benefits to parties engaged in a labor dispute. Petitioners' efforts to undermine the rationale of the Kennedy decision are unconvincing.[12] We find the Board's approval of the Pact, as amended, fully consistent with the national labor policy and the RLA.
 
 III.
 
 8
 There is no indication either in the initial opinion of the Administrative Law Judge or in the CAB's opinion that the unions presented their antitrust objections to the Pact in the proceedings before the agency. As a technical matter, therefore, we are precluded from considering the antitrust attack absent any reasonable grounds for failure to pursue that attack before the CAB.[13] As a practical matter, we cannot exercise an appellate function in the review of administrative matters unless the problems have been fully aired and focused in the proceedings below. The Federal Aviation Act (FAA) specifically exempts agreements approved by the CAB from the operation of the antitrust laws.[14] The initial forum in which to raise antitrust objections remains the agency which is charged with the primary determination of the public interest.[15]
 
 IV.
 
 9
 In passing on agreements among air carriers under 49 U.S.C. 1382, the CAB is required to disapprove any agreements which it finds to be 'adverse to the public interest.' The courts may not overturn the CAB's findings of fact unless they are unsupported by substantial evidence on the record.[16] Nor may they upset the final judgments of the CAB unless they fall outside a zone of reasonableness.[17] It is urged, however, that because the CAB lacks expertise in labor matters, its decisions impinging on the activities of unions in the airlines industry are to be accorded less weight than these standards imply, although petitioners fail even to articulate an alternative standard.[18]
 
 
 10
 The CAB is not a labor board, of course, as it is first to concede.[19] Yet we have already concluded that its decision in this case is consistent with national labor policy, such as it may be discerned. Beyond that, a proper evaluation of the Pact's effect on the unions and their members necessarily involves a firm grasp of industry practices under the agreement, and the CAB's grasp has reason to be firm. Against a background knowledge of the industry's economic structure, the CAB has monitored the Pact since its inception sixteen years ago and has the benefit of three full evidentiary hearings conducted on the Pact in 1962, 1966 and 1970.[20]
 
 
 11
 Despite the CAB's experience with the Pact, we would not affirm, of course, if issues of employee welfare had been ignored or slighted. This court has previously pointed out 'the Board's duty to consider the welfare of carrier employees under the public interest standard when it approves agreements under Section 412.'[21] But in a finding that the unions do not dispute, the Board in this case declared
 
 
 12
 that the employees retain substantial and effective bargaining power regardless of the Mutual Aid Agreement. Thus, the record shows that air carrier wages . . . are higher than, and . . . have increased faster than, wages in other industries, including other transportation industries.[22]
 
 
 13
 We do not think the Board need have gone further in this respect.
 
 
 14
 In assessing the net impact of the Pact and its new amendments, the CAB also took into account, inter alia: the industry's vulnerability to strikes; the tendency of the Pact, as amended, to promote or prolong strikes; and the impact which the agreement has on the viability of marginal companies. Since the basis of the CAB's findings on each of these points is vigorously attacked by the unions, we will review in some detail the evidence on which the Board bases its findings.
 
 
 15
 The Board found that the air transport industry 'suffers a greater impact by strike than do other industries, and is therefore more vulnerable to strike(s) . . . than are other industries.' The unions claim that this finding is based on a misreading of the testimony of Dr. Herbert R. Northrup of the Wharton School of the University of Pennsylvania.[23] On our reading of the statement, Dr. Northrup seems quite explicit that airlines-- like other service industries in which the ability to stockpile is limited-- are particularly vulnerable to strikes and furthermore that they are more vulnerable to strikes than other transportation industries with a higher percentage of freight traffic, which can be stored pending settlement.[24] In defending the peculiar suitability of the Mutual Aid Pact for the airlines industry, the Board did not purport to find that air carriers were more sensitive to work stoppages than all other transport industries; nor was such a finding necessary.
 
 
 16
 The two remaining findings of the Board which come under special fire are: (1) that the Pact, as amended, is not likely to have a serious impact on the willingness of companies to sustain or prolong strikes; (2) that the payments required by the Act do not and are not likely to affect the viability of small or economically marginal airlines. These findings are defensive in nature. They are central to the Board's answer to allegations that the Pact poses risks to the stability and smooth operation of the airlines system which outweigh the benefits on which we have touched. If either finding were unsupported, we would have difficulty in countenancing the Board's decision. But we do not so conclude.
 
 
 17
 Although the CAB followed the Administrative Law Judge's view that 'the record does not establish that any carrier has incurred or prolonged a strike because of the increased level of mutual aid,'[25] it differed from his assessment of a substantial danger that the amended Pact would result in significantly longer and more frequent work stoppages. In concluding that this risk was not substantial, the Board noted the relative infrequency with which negotiations in the airlines industry have erupted into strikes in recent years. The statistics cited cover the period from 1968-1971, during at least part of which the new amendments were actually in effect.[26]
 
 
 18
 The CAB's finding on the prolongation issue is further supported by the Board's determination that significant financial pressures to settle remain on the airlines despite their participation in the Pact. The unions point out that in 1970 some airlines actually experienced operating profits during periods of strike when supplemental payments under the Pact were taken into account. But the Board reasonably believed that in assessing the dynamics of the companies' position during strikes, operating profits should be compared to 'normal profits' for a similar period-- profits which the company would have enjoyed if it had not sustained a strike. Similarly, it included in its model 'poststrike losses.' These take in the cost of resuming operations, losses attributable to the absence of advance bookings and 'the long-term loss of traffic attributable to the loss of carrier identity in the market . . ..'[27]
 
 
 19
 Clearly 'normal profits' and 'post-strike losses' are based to some degree, as petitioners assert, on 'speculation and hypothecation,'[28] but the absence of certainty does not preclude the Board from making a considered judgment on the best information available. One could wish that the Board had addressed itself to the methodological problems inherent in estimating these loss factors: it simply stated that it considered the companies' figures to have been 'reasonably estimated' and adopted them as its own.[29] Yet the unions do not point to evidence that the companies reached their estimates by misguided or meritricious methods. And the CAB did seek to control the risk of error by limiting its approval of the agreement to a period of five years. Thus, if the CAB's 'hypothecations' prove wrong, they may be corrected.
 
 
 20
 The Board also found that the Pact offers no significant threat to the financial stability of its members. Although the Administrative Law Judge reached a different assessment of the risk involved, he believed the record did not 'demonstrate that the viability of any carrier has been critically threatened because of the higher level of contributions required under the amended agreement.'[30] The CAB reinforced its own evaluation by reference to the amounts paid out by various airlines as compared with strike losses incurred.[31] These statistics cover the period from January 1970 to June 30, 1971, when the new higher ceilings were in effect. The Board concluded, not unreasonably, that the payments are not out of proportion to the gains from the protection offered. The balance of costs and benefits in favor of allowing the agreement was found to be particularly true for financially weak carriers, which stand to lose most from strikes or threats of strike.[32] This line of justification also supports the Board's approval of the 1971 amendment allowing local service carriers to join the Pact, for these carriers, as a group, are likely to be less stable, and therefore more vulnerable to strikes than trunkline carriers.
 
 
 21
 Of course, the ceiling imposed by the Pact provides some safeguard against oppressive payments. And although liability for windfall payments may bring a carrier's total obligation to more than one percent of its operating revenues, the Board argues correctly that the windfall payments represent no added burden to the company which must pay them, because they represent only profits which the company could not have expected to enjoy absent the strike suffered by its competitor.
 
 
 22
 We conclude that the findings on which the Board rests its decision are adequately supported and that the result reached is a reasonable one.
 
 V.
 
 23
 We have carefully considered the unions' remaining contentions.[33] We believe that only one warrants discussion. The unions say the CAB erred in failing to adopt a condition that would have precluded consideration of amounts paid out under the Pact as expenses for the purpose of establishing rates. As the CAB recognized,[34] the petitioners are seeking to pursue this issue in the wrong procedural context. The authority of the Board to review and prescribe air carrier rates is exercised in distinct proceedings under the FAA.[35] If the unions feel that the rates charged by the airlines are unreasonable because they include allowances for payments under the Pact, they may institute proceedings before the CAB under 49 U.S.C. 1482(d). Petitioners suggest that their objection would be 'buried' in a ratemaking proceeding.[36] If this should happenand if the unions are so advised, they may seek judicial review.[37]
 
 
 24
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. 294(d)
 
 
 [1]
 CAB Order 73-2-110, Feb. 27, 1973, Joint App. 268a
 
 
 [2]
 Initial Decision of Examiner Arthur S. Present, Joint App. 271a
 
 
 [3]
 NLRB v. Insurance Agents' Int'l Union, 361 U.S. 477, 490, 80 S.Ct. 419, 427, 4 L.Ed.2d 454 (1960)
 
 
 [4]
 See 45 U.S.C. 154-163, 183-185
 
 
 [5]
 See Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378-379, 89 S.Ct. 1109, 22 L.Ed.2d 344
 
 
 [6]
 45 U.S.C. 152 First
 
 
 [7]
 Id. 152 Fourth
 
 
 [8]
 Opinion of the CAB, Feb. 27, 1973, Joint App. 240a-41a
 One instance of an alleged RLA violation by an airline is noted, but it was not shown to have any connection to carrier membership in the Pact. Id., Joint App. 241a.
 
 
 [9]
 See id., Joint App. 240a n. 14
 
 
 [10]
 29 U.S.C. 52
 
 
 [11]
 29 U.S.C. 104
 
 
 [12]
 Petitioners' argument is based in part on a later holding of the Second Circuit, NLRB v. A. & P. Stores Inc., 340 F.2d 690, that a lockout by employers who were not in the same bargaining unit as the company being struck was violative of the National Labor Relations Act. Petitioners urge that this case implies that multiemployer aid is impermissible except in the context of multiemployer bargaining units, which presently do not exist in the airlines industry. A. & P. is easily distinguished from Kennedy in that the court's result in A. & P. turned on a finding that the lockout violated section 8(a)(1) of the NLRA as a device to force the unions to accept multiemployer bargaining units. As we have noted, text accompanying note 9 supra, the Pact does not appear to have such coercive tendencies
 The unions also resort to Brotherhood of Railway & Steamship Clerks v. Florida East Coast R.Y., 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966), which held that during a strike period a railroad could make some alterations in its contracts with the unions without submitting these alterations to the lengthy negotiations procedures required by the Act. The unions attempt to read into this case a principle limiting the use of employer self-help whose effect is to prolong strikes. In fact, the decision vindicates the right of self-help in the face of the technical requirements of the Act by allowing the employer to make adjustments necessary for continued operations during the strike subject only to approval by the district court.
 
 
 [13]
 49 U.S.C. 1486(e) provides:
 No objection to an order of the Board . . . shall be considered by the court unless such objection shall have been urged before the Board . . . or, if it was not so urged, unless there were reasonable grounds for failure to do so.
 
 
 [14]
 49 U.S.C. 1384
 
 
 [15]
 In prior rulings, the CAB has dealt with antitrust objections to the Pact. See, e.g., Opinion of the CAB, July 10, 1964, Joint App. 441, 66a-67a. It concluded that the Pact 'has not operated in restraint of trade or lessened competition between air carriers . . ..' However, we do not consider these prior rulings, or the findings which they contain, to be proper subjects of review at this juncture. See 49 U.S.C. 1486(a) (precluding appeals from orders of the CAB after 60 days of decision except by leave of court on a showing of reasonable grounds for failure to file in timely fashion)
 
 
 [16]
 49 U.S.C. 1486(e): 'The findings of fact by the Board . . ., if supported by substantial evidence, shall be conclusive.'
 
 
 [17]
 See e.g., American Airlines, Inc. v. CAB, 98 U.S.App.D.C. 348, 354, 235 F.2d 845, 851 (1956)
 
 
 [18]
 Brief for Petitioner Air Line Pilots Ass'n, Int'l at 8-9
 
 
 [19]
 Brief for Respondent CAB at 16
 
 
 [20]
 Cf. National Aviation Trades Ass'n v. CAB, 136 U.S.App.D.C. 367, 372, 420 F.2d 209, 214 (1969) (endorsing CAB's competence to make findings relevant to antitrust factors despite its lack of expertise as such in the antitrust field)
 
 
 [21]
 Air Line Pilots Ass'n, Int'l v. CAB, 154 U.S.App.D.C. 316, 321, 475 F.2d 900, 905 (1973)
 
 
 [22]
 Opinion of the CAB, Feb. 27, 1973, Joint App. 234a-35a
 
 
 [23]
 Trunkline Carrier Exhibit No. 80
 
 
 [24]
 Id. 11-12
 
 
 [25]
 Initial Decision of Examiner Arthur S. Present, Joint App. 301a
 
 
 [26]
 Ironically, the unions cite the same statistics in their attempts to refute the CAB's findings on the strike vulnerability issue. Brief of Petitioner Air Line Dispatchers' Ass'n at 40. This would seem to ignore that the Pact was in effect during the entire period covered by the figures
 
 
 [27]
 Opinion of the CAB, Feb. 27, 1973, Joint App. 236a
 
 
 [28]
 Brief of Petitioner Air Line Dispatchers' Ass'n at 30
 
 
 [29]
 These methodological problems do receive extensive treatment by company experts on the record. See Trunkline Carrier Exhibit Nos. 50-52. Presumably these discussions provided the basis of the CAB's acceptance of the estimates
 
 
 [30]
 Initial Decision of Examiner Arthur S. Present, Joint App. 301a
 
 
 [31]
 Opinion of the CAB, Feb. 27, 1973, Joint App. 243a-44a
 
 
 [32]
 Id., Joint App. 245a
 
 
 [33]
 These include a claim of bias on the part of CAB, which we deem without substantial foundation
 
 
 [34]
 The CAB refused to take evidence on this point. Brief of Petitioner Air Line Pilots Ass'n, Int'l at 72
 
 
 [35]
 49 U.S.C. 1482(d)
 
 
 [36]
 See Brief of Petitioner Air Line Pilots Ass'n, Int'l at 73
 
 
 [37]
 See 49 U.S.C. 1486(a)