**ALIANZA FEDERAL de MERCEDES et al., Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellants, Hubbard Broadcasting Inc., Intervenor.**

No. 74–1895.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 23, 1975.

Decided April 27, 1976.

As Amended April 29, 1976.

Tracy A. Westen, Washington, D. C., for appellants.

Daniel M. Armstrong, Acting Associate Gen. Counsel, F. C. C., Washington, D. C., for appellee. Ashton R. Hardy, Gen. Counsel, F. C. C., Joseph A. Marino, Associate Gen. Counsel, F. C. C., Washington, D. C., at the time the brief was filed, and Julian R. Rush, Jr., counsel, F. C. C., Washington, D. C., on brief.

James P. Riley, Washington, D. C., with whom Frank U. Fletcher and Marvin Rosenberg, Washington, D. C., on brief for intervenor.

Before LEVENTHAL and ROBB, Circuit Judges· and SOLOMON,* United States Senior District Judge for the District of Oregon.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

LEVENTHAL, Circuit Judge:

Alianza Federal de Mercedes, a Mexican-American group in New Mexico, challenges a Federal Communications Commission Order[1] which granted a 1971–1974 license renewal to Hubbard Broadcasting's KOB–TV station in Albuquerque, New Mexico.[2] Alianza contends that access to broadcast license financial information is necessary to measure the adequacy of a licensee's past performance. Alianza also asserts that it raised substantial and material issues of fact about KOB–TV's programming and employment practices sufficient to demonstrate *prima facie* that license renewal would contravene the public interest. We hold that disclosure of licensee financial information is not required as a matter of law, and that no substantial and material issues of fact were raised that would require an evidentiary hearing on the Petition to Deny the Renewal Application. We therefore affirm the FCC's approval of KOB–TV's license renewal application.

## I. BACKGROUND

Alianza is a non-profit New Mexico corporation organized in 1963 to combat discrimination against Mexican-Americans. It· estimates its membership at approximately 3,000 families of Mexican-American descent. Alianza has taken an active role in seeking to make Albuquerque stations responsive to the needs of the Mexican-Amer-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Hubbard Broadcasting, Inc., 48 F.C.C.2d 517 (1974).

2. Alianza appeals under 47 U.S.C. § 402(b)(6) (1970).

ican community—an ethnic group that comprises some 40 percent of Albuquerque's population. In July, 1971, Alianza petitioned the FCC to be allowed to inspect the KOB–TV Form 324 financial statements in its files,[3] and asked for an expedited decision. The FCC rejected the expedited decision request. Appellants Alianza and William Higgs thereupon filed a timely petition to deny the license renewal application. Appellants emphasized particularly KOB–TV's failures to present programs on discrimination against Mexican-Americans and on the question of whether Mexican-Americans were illegally deprived of Spanish land grants.

On September 2, 1971, the Commission denied the request for inspection of KOB–TV's financial statements.[4] This court initially declined to review that decision on the ground that the issue was raised prematurely.[5]

Hubbard Broadasting, intervenor here and the licensee of KOB–TV, filed an opposition to appellants' petition to deny renewal of its broadcasting license, and Alianza filed a reply.

On August 28, 1974, the Commission issued its opinion. The FCC found: 1) petitioners did not meet the burden of presenting substantial and material allegations of fact indicating that renewal would be *prima facie* inconsistent with the public interest; 2) KOB–TV's programming has been responsive to the problems of the public which it serves, including Mexican-Americans; 3) there was no showing that the licensee had abused its overall programming discretion by (a) treating the discrimination and land grant questions only in news programming, (b) failing to seek out Alianza to present its views, or (c) failing to use public service announcements dealing with the discrimination and land grant questions; 4) KOB–TV's programming proposals are responsive to ascertained community problems and need not be judged by an overall quantitative standard; 5) KOB–TV's application demonstrates substantial compliance with the ascertainment Primer; 6) KOB–TV's employment statistics indicate adequate commitment to its policy of equal employment opportunity.

## II.  PRELIMINARY ISSUES

■  A.  *Mootness.*  Shortly after the Commission granted (on Aug. 28, 1974), KOB–TV's license renewal for the 1971–1974 period it granted (on Sept. 27, 1974) a renewal of license for the period October 1, 1974, to October 1, 1977. Alianza did not seek denial of the 1974–77 renewal application. In our view, the unopposed grant for 1974–77 does not moot this appeal from the 1971–74 term license grant.

■  It has been basic to the understanding of the renewal process by both Congress and the Commission that a licensee runs on his past record,[6] and that grants

---

**3.** Section 1.611 of the Commission's Rules, 47 C.F.R. § 1.611 (1975), requires each licensee of a commercial AM, FM, or television station to file with the Commission, on April 1st of each year, an Annual Financial Report on FCC Form 324.

**4.** Alianza Federal de Pueblos Libres, 31 F.C.C.2d 557 (1971). The Commission decided that 1) Alianza did not make the "persuasive showing" required by the Commission for financial statement disclosure; 2) the Commission does not currently consider the degree of profit reinvestment in community programming as a factor in determining whether the licensee's public service obligations have been met; 3) annual financial reports as presently constructed do not provide sufficiently precise information for an accurate evaluation of programming expenditures; and 4) a change in the confidential

status of financial information should be accomplished by rulemaking.

**5.**  *Alianza Federal de Pueblos Libres v. F. C. C.,* No. 71–1779, reported at 25 Pike and Fischer Radio Regulation 2d 2077 (D.C.Cir., Oct. 4, 1972).

**6.**  *See, e. g.,* H.Rep.No.93–961, 93rd Cong., 2d Sess., pp. 7, 17 (1974) (licensee runs on record, and this is past performance during "its expiring license term"). In KORD, Inc., 21 Pike & Fischer Radio Reg. 781, 784 (1961), the Commission expressly rejected programming improvements made after expiration of the license period under examination. *Accord,* Policy Statement Concerning Comparative Hearings Involving Regular Renewal Applicants ("the renewal applicant must run upon his past record in the last license term"), 22 F.C.C.2d

of licenses are subject to the limitations of the Communications Act.[7] Two of those limitations [8] are the right to judicial review, and the obligation of the Commission to give effect to any resulting judgment. If giving effect to a judgment of this court culminates in a Commission order vacating its grant of KOB–TV's 1971–74 license renewal, this would work a change in the basis for granting or denying a 1974–77 term to KOB–TV. As of 1974, KOB–TV would have no outstanding license to renew, it would no longer have any legitimate renewal expectancies,[9] and could file a new application only after a one-year interval.[10] A case is not moot when, as here, substantial ongoing rights of the parties continue to turn on the resolution of the issues it poses.

■ B. *The Standard of Review.* There is no assertion that the Commission has acted beyond its statutory authority. Hence we review the Commission's renewal standards and application of those standards only to assure that the Commission did not abuse its discretion or act arbitrarily or capriciously. We use the same frame of reference in evaluating the Commission's statement of reasons for denying a hearing. *See Columbus Broadcasting Coalition v. FCC,* 164 U.S.App.D.C. 213, 217, 505 F.2d 320, 324 (1974).

■ A hearing is required only when a petition to deny makes "substantial and specific allegations of fact which, if true,

would indicate that a grant of the application would be *prima facie* inconsistent with the public interest." *Stone v. FCC,* 151 U.S.App.D.C. 145, 151, 466 F.2d 316, 322 (1972). A hearing is not required when facts are undisputed or when the case turns on only the "inferences to be drawn from facts already known and the legal conclusions to be derived from these facts."[11]

## III. APPELLANTS' SPECIFIC OBJECTIONS TO LICENSE RENEWAL

A. *Responsiveness of Programming to Community Needs*

Appellants want this court to require the Commission to use quantitative standards or evaluations in measuring past programming adequacy. This is an area in which qualitative evaluations are suspect as intrusions into the broadcaster's First Amendment freedoms but in which the Commission nevertheless has an obligation to assure operation in the public interest.

■ Appellants stress the need for a better measure of performance than the current Commission method requiring a licensee to identify community problems, and to explore an undefined number of those problems through undefined types of public interest and news programming. We have not been insensitive to the weaknesses in the Commission's ascertainment process. In *Stone v. FCC,* we noted that failure to include such non-problem areas of interest

---

424, 427 (1970), *rev'd on other grounds sub nom. Citizens Communications Center v. FCC,* 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971) *clarified* 149 U.S.App.D.C. 419, 463 F.2d 822 (1972).

7. 47 U.S.C. § 307(a) (1970), makes license grants from the Commission "subject to the limitations of this chapter."

8. 47 U.S.C. § 402(b)(6) and (c) gives petitioners a right to seek within thirty days of the grant of license renewal a judicial determination of the validity of the grant without a hearing. 47 U.S.C. § 402(h), requires the Commission to "give effect" to and "carry out" the judgment of the Court in the event the Court reverses a Commission order on appeal.

9. This court has indicated that there are "legitimate renewal expectancies implicit in the structure of the [Communications] Act." *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 396, 444 F.2d 841, 854 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

10. 47 C.F.R. § 1.519 (1975). This rule is phrased in terms of a one-year interval after Commission denial of an application for a *new* station; however, the Commission has interpreted it as applicable to an existing licensee whose application for renewal is denied. Alabama Educational Television Commission, 50 F.C.C.2d 461, 477–78 and n. 27 (1975).

11. *See Columbus Broadcasting Coalition v. FCC,* 505 F.2d at 324, and cases cited, note 11.

as family life, art, and social interaction may leave out public needs that are "often much more important in both everyday life and in media programming than the problems of a community."[12] Disclosure of financial information might be helpful as a means of gauging public interest programming, but we cannot say that the Commission is required as a matter of law to make such information available.

Appellant's second argument is that public interest programming that is allocated in only a minuscule amount to serving the needs of a 40% minority community is *prima facie* inconsistent with the public interest. However, this argument was never clearly articulated to the Commission in the first instance or in a petition for rehearing.

### 1. *Disclosure of Financial Information*

The FCC uses financial information in its regulatory activities. It requires that a station not only file an annual financial statement describing operating expenses on Form 324, but also disclose its balance sheet to the public at renewal time.

The Commission considers revenue adequacy and reinvestment relevant when it is alleged that the addition of a new station to a market area will threaten an overall reduction in public interest programming, or when it is considering approving a change in ownership. *See Carroll Broadcasting Co. v. FCC,* 103 U.S.App.D.C. 346, 258 F.2d 440 (1958); *Wichita-Hutchinson Co., Inc.,* 19 FCC 2d 433, reconsidered in part, 20 F.C.C. 2d 584, transfer denied, 20 F.C.C. 2d 951 (1969). But when the Commission is considering the renewal of an application and no opposing group is seeking that license, the issue is not which applicant or how many licensees will best serve the public

interest. The Commission simply determines whether the licensee has operated in the public interest in the past, and whether its proposed programming makes it likely to operate in the public interest in the future.[13] Once that determination is made, the Commission does not try to evaluate whether the licensee could have done a better job of operating in the public interest. The Commission assures itself that the station has carried out a study that adequately ascertains the local community's perceived problems, and that the station has carried programming responsive to some of the identified problems. Since there are no standards about how much programming is enough to meet those problems or about how many of the identified problems have to be dealt with in the scheduled programming, both licensees and those groups seeking to make them more responsive to the public are understandably uncertain about the Commission's rather amorphous expectations. Although it may not be the most desirable form of regulation, it is permissible for the Commission to look to and to evaluate the adequacy of the finished product that it regulates—the station's programming—rather than to adopt a regulatory approach inquiring into the financial resources a licensee devotes to serving the public interest.

The Commission does provide by rule[14] for the release of confidential financial information upon a persuasive showing that the financial information is a "necessary link in a chain of evidence that will resolve the public-interest issue," and not merely where there is a "chance it might be helpful." *Sioux Empire Broadcasting Co.,* 10 F.C.C.2d 132, 134 (1967).[15] Even if Alianza had made a *prima facie* showing that KOB–TV had not operated in the public interest,

---

**12.** 466 F.2d at 328, note 44.

**13.** Of course, revenue information could become relevant at this stage if a station decided to defend its poor public interest programming record on the ground of inadequate revenues.

**14.** 47 C.F.R. § 0.461 (1974).

**15.** This showing must include ". . . the reasonable necessity for petitioner's having the

information, the position of the station in the proceeding involved, the inability to obtain the requested information from other sources, and the relevancy and materiality of the information sought." *Sioux Empire Broadcasting Co.,* 10 F.C.C.2d 132, 134 (1967), describing *Multivision Northwest, Inc.,* 8 FCC 2d 892, aff'd, 10 FCC 2d 391 (1967).

however, the station's financial ability to provide public interest programming would not now be a factor considered by the Commission in determining whether the station had operated in the public interest. Thus Alianza could not make a persuasive showing that the financial information was a necessary link in a chain of evidence, or even material.[16]

■ In refusing Alianza access to KOB–TV's financial information, the Commission also noted that the change in substantive policy urged by Alianza would be better considered through a rulemaking proceeding. Since disclosure or consideration of financial information is not required as a matter of law in Commission evaluation of public interest programming, it is within the Commission's discretion to choose a procedural format it deems appropriate for the development of substantive policy. *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974).

*2. Quantitative Evaluation of Programming Addressing the Problems of a Large Minority Community*

Working with the Commission's existing ascertainment process, Alianza asserts on appeal that the maximum of 6 hours and 55 minutes identified by the Commission as a year's KOB–TV programming responsive to minority community problems is a *prima facie* failure to meet the public interest where the minority comprises 40% of the public being served. Although we have held in *Stone* and *Columbus Broadcasting Coalition, supra,* that programming is a matter largely in the discretion of the licensee and is not to be measured by a simple percentage test, we are troubled by appellants' contentions, and by the issue whether the minimal amount of public interest programs serving the needs of a 40% minority does not create a disparity so significant as to amount to a difference in kind rather than in degree. Excluding news shows, KOB–TV spent a maximum of 6%, and a minimum of 2% of its public interest programming dealing with problems of interest to the Mexican-American community.[17] The Commission could find that such a gross disparity in allocation of programming time indicates a broadcaster's failure to serve his community's needs. Such a finding could suffice to deny renewal as a matter of law, or to establish a *prima facie* case that the broadcaster was not acting in the public interest and that a hearing was required. There would have been a particularly appropriate scope for that approach in this case, where KOB–TV's demonstration that its 1968–71 programming met community needs was based on an ascertainment study done for its 1971–74 prospective programming.[18]

■ However, Alianza's petition to deny renewal did not specifically urge the disparity in allocation of public interest programming time to the needs of the Mexican-American community as a ground for denial. Nor did it criticize KOB's reliance on a 1971 ascertainment study to validate

16. Of course, if the FCC explicitly or implicitly adopted a financial ability standard in finding that a station operated in the public interest, the right to access to that information would be presented in a very different light than it appears now.

17. There is no explicit computation of the number of hours of public interest programming done each year by KOB–TV; however its application indicates that it undertakes a minimum of 2 hours per week, and it used 3½ hours per week in its composite week description. Alianza asserts that the programming cited by the Commission as dealing with Mexican-American problems composed 6 hours and 55 minutes; Alianza computed such programming as 3 hours, 17 minutes, and 30 seconds.

18. *Cf., New Mexico Broadcasting Co., Inc.,* 34 Pike & Fischer Radio Regulation 2d 501, 509 (1975), ¶ 17; "To the extent that this survey has been made in the context of its 1971 ascertainment efforts, it is prospective, and tells us nothing about what the problems and needs of any particular group or of the community as a whole have been during the 1968–71 license term. Once a petitioner has raised questions about the adequacy or responsiveness of a station's past programming . . . the burden is upon the licensee to demonstrate the responsiveness of its past programming to the service area."

its 1968–71 programming.[19] Its primary thrust, identified on a fair reading of its petition by the Commission, was rather the failure of KOB–TV to address programming to the questions of principal concern to Alianza—racial discrimination and land grants. Alianza also alleged in a broad, conclusory way that the overall level of public interest programming was insufficient. Raising the explicitly quantitative argument [20] for the first time before this court [21]—that a *prima facie* case of failure to serve the public interest is made out by the absolute paucity of programs devoted to Mexican-American problems—does violence, however, to the scheme of agency-court partnership [22] contemplated by the Communications Act. The Commission must be given a fair opportunity to pass on a novel legal or factual argument, either initially or on a petition for reconsideration, before it can be brought before a reviewing court.[23] Otherwise, the reviewing court would in effect be exercising primary jurisdiction over any issue not raised in front of the agency. We cannot say that the quantitative arguments made by Alianza before us were fairly raised in the case shaped by

Alianza before the FCC;[24] the grist was there, but nothing was made of it. The identification of this problem required some digging into the record to bring matters into focus. Hence, we cannot presume that the matter was deliberately considered by the FCC. In the circumstances, we are foreclosed from evaluating this quantitative claim.

▉▉▉▉ Putting aside the quantitative sufficiency issue, the Commission scrutinized KOB's total public interest programming to find that it served the public interest, and that Mexican-American interests were served by enumerated programs, as well as by news broadcasts dealing with racial discrimination and the land grant question.[25] The Commission also properly emphasized that the station need not address *every* problem it identifies through its ascertainment studies. We cannot say that this approach was erroneous as a matter of law, or condemn the Commission's conclusion that even assuming the truth of Alianza's allegations, a *prima facie* case for denial of renewal was not established.

B. *Employment*

19. Such criticism, if made, might have appeared particularly significant in light of the inarticulateness of the Mexican-Americans interviewed in the 1971 ascertainment effort. Sixty-three per cent of those interviewed failed to identify any community problems, thus effectively skewing the station's justification of both past and future programming needs away from the Mexican-American community.

20. *See, e. g.,* Alianza's reply brief at 25.

21. There was also a hint of the quantitative argument in the joint reply Alianza made during its efforts addressed to gaining disclosure of the Albuquerque stations' financial information. (Joint Reply to Oppositions to Financial Disclosure Request, filed by Alianza Federal de Pueblos Libres, on August 17, 1971). That falls short of alerting the FCC to the present contention that even assuming no need shown for the financial information, there was a *prima facie* showing that required denial in the absence of explanation or rebuttal.

22. *Greater Boston, supra,* 444 F.2d at 851.

23. 47 U.S.C. § 405 (1970): "The filing of a petition for rehearing shall not be a condition precedent to judicial review of any such order,

decision, report, or action, except where the party seeking such review . . . (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass." As stated in *U. S. v. L. A. Tucker Truck Lines,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54, 58 (1952), "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." Accord: *Air Line Pilots Ass'n v. CAB,* 163 U.S.App.D.C. 451, 502 F.2d 453, 457 (1974), *cert. den.* 420 U.S. 972, 95 S.Ct. 1391, 43 L.Ed.2d 652 (1975).

24. *Cf. Columbia Gas v. FPC,* 174 U.S.App.D.C. 204, 530 F.2d 1056 (1976).

25. Contrary to Alianza's assertion, news programming can be considered by the Commission in evaluating public interest programming, although it cannot be the primary means of serving the public interest. Primer on Ascertainment of Community Problems, 27 FCC 2d 650, 686 (1971).

Alianza maintains that KOB–TV has failed to comply with the Commission's equal employment opportunity rules, 47 C.F.R. 73.680 (1975). However, the Commission found that KOB–TV had adopted an equal employment opportunity program and that the "long-term trend" in KOB–TV minority employment confirms that finding. Minority employment increased from 4.5% in 1971 to 17.3% in 1973, and their representation has not been concentrated in the lower paying jobs. In this setting, the law does not impose a requirement that the percentage of minority employees correspond to the percentage of minorities in the population of the community as a whole. We see no reason to disturb the Commission's findings.

*Affirmed.*